**CONWAY v. SILESIAN–AMERICAN CORP. et al.**

No. 85, Docket 21755.

United States Court of Appeals
Second Circuit.

Argued Nov. 8, 1950.

Decided Dec. 26, 1950.

Oliver T. Cowan, of New York City (Goldwater & Flynn and William C. Hare, of New York City, on the brief), for appellee Francis X. Conway, trustee.

Thomas A. McGrath, of New York City (William Gilligan, of New York City, on the brief), for appellant Silesian-American Corp.

Leonard P. Moore, of New York City (Chadbourne, Parke, Whiteside, Wolff & Brophy, Clair B. Hughes, and Edward R. Neaher, all of New York City, on the brief), for appellant Silesian Holding Co.

Charles E. Scribner, of New York City (Scribner & Miller, Louis G. Bernstein, and Robert J. Sands, all of New York City, on the brief), for appellants Edward W. Smith and others as Protective Committee for the Holders of the 7% Collateral Trust Bonds due August 1, 1941.

George B. Searls, Atty., Dept. of Justice, Washington, D. C. (Harold I. Baynton, Asst. Atty. Gen., Director, Office of Alien Property, Abe W. Weissbrodt, Atty., Dept. of Justice, Washington, D. C., and Irving H. Saypol, U. S. Atty., of New York City, on the brief), for appellant J. Howard Mc-Grath, Atty. Gen.

George Zolotar, Sp. Counsel, Securities and Exchange Commission, New York City (Roger S. Foster, Gen. Counsel, David Ferber and Lawrence M. Greene, Sp. Counsel, Securities and Exchange Commission, and Meyer Feldman, all of Washington, D.

C., and Ezra Weiss and Kiva Berke, New York City, on the brief), for Securities and Exchange Commission.

Before AUGUSTUS N. HAND, CHASE, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

This appeal brings before us as its main feature a district court order approving as fair, equitable, and feasible the trustee's plan for the reorganization of Silesian-American Corporation, a Delaware holding company, which was the conduit whereby American investors in the golden twenties put money into a Polish corporation owning and mining extensive zinc and coal deposits in Upper Silesia. In the light of existing world conditions the mines, now in the possession of the present Polish Government, are obviously beyond reach of any American bankruptcy court. The trustee's plan therefore is in substance a distribution of the salvage from the wreck, consisting in the main, beyond some few assets on hand, of an amount offered by a syndicate of Swiss banks which had received deposits from the original mine owners to retire the debtor's bonds. Objectors to the plan direct their sharpest attack upon the asserted inadequacy of the Swiss offer. Hence the major issue on this appeal is whether the court below was justified in accepting and adopting the trustee's view that the offer constituted an appropriate adjustment of conflicting claims and in any event was all that could be reasonably realized from that source. Other issues involve the possibility of a claim against the present Government of Poland and the desirability of suit by the trustee against the original promoters of the debtor, together with various details of the plan which are attacked by some or more of the objectors. On all these points the district court, in approving the plan, found with the trustee in concluding that nothing more of substance for the bondholders could be reasonably expected. Objectors to the plan, in addition to the debtor and its principal stockholder, Silesian Holding Company, are Edward W. Smith *et al.*, as Protective Committee for the Holders of the 7% Collateral Trust Bonds here particularly involved, and J. Howard Mc-Grath, Attorney General of the United States, as successor to the Alien Property Custodian representing a German interest seized by that office. The Securities and Exchange Commission filed below a very extensive report which went into the history of the debtor in all aspects and the merits of the plan and both vigorously opposed its acceptance and strongly urged the pressing of legal action against the Swiss banks and others. This position it reaffirms here in brief and oral argument urging reversal of the district court order.

The proposal of the Swiss banks calls for a definite and final adjustment whereby, upon its acceptance, those banks will be freed from any liability in the future and will indeed share in substantial amount in the securities and obligations of the corporation, as reorganized for the future collection of contingent claims. It thus presents a somewhat different situation from the other potential claims in favor of the debtor which in theory at least may be still subject to some realization even after execution of the plan. Because of this fact and because the offer does assure the estate of certain definite funds at once, we must consider it in detail. Since decision here is so highly a matter of judgment, indeed of shrewd appraisal of what may be the possibilities of lengthy litigation as against an immediate smaller payment in hand, we obviously cannot find any sure or pat answer. The trustee naturally urges that we must give strong weight to the decision below, suggesting that it must be sustained as a finding of fact based on the preponderance of credible evidence, and therefore not "clearly erroneous" under Fed.Rules Civ.Proc. rule 52(a), 28 U.S.C.A. But we are not justified in thus oversimplifying this difficult problem, so much more one of forecasting the future than of restating the past. Naturally careful consideration is due the conclusion of the able district judge who has had this lengthy reorganization so long under his control. At the same time we cannot overlook the fact that the governmental agency charged with substantial responsibility in the premises, the Securities and Exchange Commission, has made an extensive investigation resulting in a

detailed and helpful report with a reasoned conclusion which the trial judge has rather summarily rejected. If the considered findings of this agency, with so much better facilities for investigation than those possessed by either this or the trial court, are to have any force beyond their initial impact below, then we think that they will largely offset the usual presumption accorded a decision of first instance. Otherwise much of the statutory purpose in creating an expert body for the consideration of technical problems will be set at naught. Compare 6 Collier on Bankruptcy ¶7.30, 14th Ed.1947. We have elsewhere stressed the importance of due regard for Commission findings, Finn v. Childs Co., 2 Cir., 181 F.2d 431, 438; and we are clear that here, too, we must give weight to the detailed evaluation of the facts made by this reliable and experienced public agency and the conclusion reached, even though this was not accepted by the trial judge.

The facts, so far as they appear of record, come in the main from the various written documents before the court, together with the Commission's report. The supplementing oral testimony from the trustee and associates and from certain representatives of German interests left many gaps which the noncooperative attitude of the Swiss banks—who avoided any disclosures except under pressure—did not fill. But the broad outlines of the story at least are clear. They present a fascinating case study of American investing in continental Europe between the world wars and what happened to it once the nations became again involved in world conflict. To this story we must now turn.

*Origin of the debtor.* Prior to World War I, certain zinc and coal mines in Upper Silesia, owned and operated by the Giesche family since 1704, were then held by the German firm Bergwerkgesellschaft Georg von Giesche's Erben. (We shall follow the parties in referring to this firm by the perhaps not fully adequate term "Erben.") Unfortunately the Erben mining properties were divided by the German-Polish boundary line set by the Treaty of Versailles in 1922, so that about 80% was allocated to Poland, and the remainder to Germany. For practical reasons the Polish properties were therefore transferred to one of Erben's subsidiaries, a firm incorporated in Prussia about 1907. This firm then became the Polish Corporation Giesche Spolka Akcyjna, referred to as Spolka.

The post-World War I operations of Erben and Spolka appear to have been financially unsuccessful. This was partly due to the fact that Poland had laid a heavy tax on the Spolka properties unpaid in the approximate amount of $10,000,000. Because unsettled conditions made it difficult to borrow German funds to pay these taxes, Erben sought a loan elsewhere.

About this time W. A. Harriman & Co., Inc., investment bankers of New York, opened an office in Berlin and in cooperation with the Guaranty Trust Company of New York made available about $5,000,000 for short-term loans to German enterprises. Through a German banking institution about $2,000,000 was lent to Erben on the strength of a fraudulent balance sheet which overstated the value of Erben's zinc inventory by several million dollars. Then Mr. Irving Rossi, Harriman's Berlin representative, to use his own words,[1] "discovered that the balance sheet was false and I notified my company's New York office of that, and in order to find a way to obtain the return of our money I developed a plan under which Harriman, together with the Anaconda Copper Company, would acquire these properties."

The plan contemplated the creation of a new American corporation to make an advance to Spolka with money to be acquired through the sale of securities on the American market. This would permit Spolka to pay off part of its debt to Erben and enable the latter, in turn, to pay Harriman. This is in brief substantially what occurred.

Sometime in 1925 Harriman therefore suggested to the Anaconda Copper Mining Company that it investigate the possibility of organizing an American corporation which would finance the purchase of the

1. On direct examination—somewhat, though unclearly, modified on cross-examination.

Spolka properties from Erben. And on July 30, 1925, Harriman entered into an agreement with Erben which—although not reproduced in the record—appears to have contemplated (1) that the proposed American company would purchase from Erben either all of Spolka's assets or all of its capital stock, and (2) that Erben would receive for the Spolka properties $10,000,000 in cash, $10,000,000 in preferred stock of the new company, and 49% of the latter's common stock. On the same day Harriman granted Anaconda an option to take over the deal for the latter's account "provided, however, that if you take over the same you agree to allot to us a fair participation in the said business upon the same terms that you undertake the same, the amount and proportion of our said participation to be fixed by agreement between the presidents of our respective companies." This instrument also incorporated by reference the Harriman-Erben agreement made the same day.

Anaconda then agreed to survey and inspect the mining properties, and so sent to Upper Silesia Mr. Laist and Mr. Sales, two of its engineers. In a notably clear and detailed report dated September 25, 1925, the engineers stated that a proposal based on the figures given above was feasible only if "the German part of the Bleischarley mine be included. Otherwise there does not appear to be enough margin to justify the risks and difficulties." The arrangements contemplated by the July 30, 1925, contracts were therefore cancelled because they had in view acquisition of the Spolka properties only. A new agreement of October 23, 1925, did contemplate the acquisition also of important zinc, coal, and lead properties in Germany; and two of Anaconda's responsible officials, Kelley and Sowerwine—then president and his assistant, now chairman of the board and vice president respectively—sailed for Europe to make the necessary arrangements with Erben to acquire the properties. But these plans and a later modification proposing to limit American participation in the German properties to a contract to refine the Bleischarley ore also fell through. This was attributed to a disinclination of the Prussian Government to countenance the sale of German resources to foreign interests.

Thereupon, and notwithstanding the report of the engineers, plans were again made to proceed on the basis of the acquisition of the Spolka properties alone. But it was first necessary to obtain some relief from the burden of the Polish taxes. On July 3, 1926, an agreement was therefore concluded with the Polish Government. Anticipating the formation of an American company which would invest large sums in the Polish properties, it provided for the waiver of the unpaid capital levies referred to above. Also to be waived, for a period of twenty-five years, were certain normal import and export duties. The joint plans thus became financially feasible and the proposed "American company" soon became a reality.

On July 7, 1926, the promoters caused two corporations to be organized in Delaware: one, the present debtor, Silesian-American Corporation, called Saco by the parties herein, and the other, Silesian Holding Company, called Sihoc. Sihoc is the immediate subsidiary of Anaconda and Harriman; its common stock is owned 65% by Anaconda and the remainder originally by Harriman, and still by Harriman or close affiliates and associates. Sihoc, in turn, received 51% of Saco's common stock and $7,000,000 out of a total issue of $12,000,000 of its 7% preferred stock. The remaining preferred and common stock of Saco went to Erben in return for the entire capital stock of Spolka. Saco also purchased $6,000,000 of Erben's first mortgage bonds of 1945, at par value and accrued interest, loaned Erben an additional $2,500,000, and, by an advance to Spolka, enabled Erben to receive $4,750,000 in settlement of a Spolka debt to it exceeding $5,500,000. Saco obtained its funds for the purpose by selling $15,000,000 worth of 7% collateral trust sinking fund bonds maturing August 1, 1941, to a group of underwriters at 88 for a total yield of $13,200,000. The underwriters, consisting of Harriman, Lee, Higginson & Co., the Guaranty Trust Company of New York, and Brown Brothers

& Co., then sold the bonds to the public at 94½.

It is thus apparent that Erben received substantial assets from Saco in return for transfer of its interests in Spolka, the direct owner of the Polish mines. But Sihoc and its owners also received substantial assets consisting of $7,000,000 of Saco's preferred stock and 51% of its 200,000 shares of no par value common stock for which they contributed nothing like such an amount if, indeed, they contributed anything. The Spolka stock was carried in Saco's first balance sheet of August 3, 1926, at the sum of $21,552,530.10.[2] But a memorandum by Sowerwine, the Anaconda executive who became an officer of Saco and of Sihoc,[3] states that "the total investment of the American group was solely the expense and work involved in negotiating the contract [of tax waiver] with the Polish Government. Their cost of the stock of Giesche Spolka Akcyjna was NIL, not $21,552,530.10."

*Operations of the debtor.* Practically speaking, Anaconda appears to have been in charge of both Saco and Spolka. Several of Anaconda's employees were sent to Poland to manage the Spolka properties; and, as we have seen, Anaconda officials such as Kelley and Sowerwine were officers of the new companies. As the bond circular used to induce purchase of the Saco bonds put it: "The operating management of the properties controlled by Silesian-American Corporation has been selected by Anaconda Copper Mining Company."

As of August 3, 1926, Spolka's indebtedness to Saco appeared to amount to $5,200,000. This figure rose until early 1932, when it was at its highest, $10,715,015, and then declined to its lowest, $6,941,741, at the beginning of 1941. Spolka paid interest on this debt up through 1939, but not since. It paid dividends only in 1927,

1928, 1929, and 1930, in the total amount of $6,181,526.

For its part Erben repaid to Saco its three-year loan of $2,500,000, and also reduced the $6,000,000 bond issue held by Saco to $2,350,000. But when Saco stopped paying dividends on its preferred stock, Erben had difficulties in providing funds to service this debt any further. It borrowed some funds from some Swiss banks, but eventually stopped paying interest on these bonds after meeting the payment required on November 1, 1937.

The Saco bond issued was backed by a sinking fund geared to zinc production. Until June, 1931, ¾¢ was to be put into the sinking fund for every pound of zinc extracted, and 1¢ per pound thereafter. Under these circumstances it was obviously to Saco's advantage to restrict zinc production when the market price was low. And if the market price of the bonds was low at the same time, which was more than likely, it was also advantageous for Saco to buy up its own bonds where the cost of acquisition was seen to be less than that of their normal retirement through the sinking fund device. Consequently it went into the open market and from time to time did purchase its own bonds. By this means Saco retired bonds of the face value of $12,490,500 at an aggregate cost of about $9,600,000 and reduced the outstanding principal amount of its original bond issue to its present figure of $2,509,500.

When World War II broke out in the fall of 1939 the entire Silesian area here involved was overrun by the German Army. The Americans in the Spolka concern were forced out one by one; the last, Spolka's general manager, left Switzerland in 1940. During the occupation the over-all supervision of the Spolka properties went to a German "Commissar" or trustee, Dr. Albrecht Jung, head of Erben's legal depart-

2. This balance sheet, together with the bond circular for prospective purchasers of the Saco bonds, is severely attacked by the S. E. C. in urging suit against the promoters.

3. And who also served as additional trustee in this reorganization until, in 1948, his resignation was asked for and received

by the court; he had not disclosed information he had obtained as to the zinc accumulations in Switzerland, discussed below, and a question had arisen as to his trading in Saco bonds during the proceedings leading to a question of his and his family's participation under the plan which the court retained for later hearing.

ment. Direct operations were apparently in charge of Dr. Eduard Schulte, Erben's general manager, and his deputy, Dr. Lothar Siemon. Thus the officials of the old Erben firm were in a position to do virtually what they chose with these properties.

Although Saco was thus deprived of all income from the Spolka properties after August or September, 1939, Saco made interest payments on its outstanding bonds through February, 1941, from cash on hand. But with the approach of August 1, 1941, the maturity date of the bonds, the company had only about half a million dollars in cash. Accordingly it filed a petition for reorganization under Chapter X of the Bankruptcy Act on July 29, 1941, 11 U.S.C. A. § 501 et seq. Its liabilities were $2,509,-500 principal amount, plus accrued interest owing to its bondholders and $11,750 owing to unsecured creditors. Its more obvious assets—in addition to cash or United States Government securities on hand which now amount to $250,000—were (1) the entire capital stock of Spolka, and (2) $2,350,000 remaining principal amount of 8½% Sinking Fund Mortgage bonds issued by Erben, due November 1, 1945, and unpaid interest coupons from these and other bonds dating from May 1, 1938.

Under the conditions obtaining since the initiation of the proceedings these are not realizable assets. But the estate has two other large potential assets. The first is against the Polish Government. That government by decree of January 3, 1946, nationalized certain of its industries. For those which were not German, it was planned at least in principle to compensate the owners. The Spolka properties here involved, however, were listed as subject to nationalization without compensation on the theory that they were actually German properties. This is based upon the fact that during the German occupation the Commissar, acting under a German law passed in the hope of repatriating these and other properties, had changed the record of the property ownership in the official Polish register so as to show German ownership. However illegal this may seem to us now, the Polish Government has stuck to its position and refuses to make payment.

Our own State Department has been consulted in the matter, but it concedes that little progress has been made because the Polish Government insists upon conditioning compensation in this case on the favorable outcome of other trade negotiations to which the United States has so far been unwilling to agree.

The other potential asset of the estate, the series of claims against Swiss banks, arises from the fact that during the occupation the Erben interests removed from the Spolka properties large quantities of ores and sold them for what might be called "their own account," depositing the proceeds with the Swiss banks under conditions and for purposes which we must now carefully consider. For about them revolve the substantial considerations affecting the worth of the Swiss offer.

*Operations of the Swiss banks.* The first appearance of the Swiss banks which is disclosed by the record is in 1929 when Erben began to borrow funds to pay its debt to Saco. By September 1, 1939, Erben owed these banks somewhat more than $4,-500,000. As collateral for this loan Erben, through one of its Swiss subsidiaries, had pledged substantial amounts of its Saco preferred and common stock.

In May, 1940, Dr. Schulte, for Erben, proposed to Brooks, the Anaconda official in charge of the Spolka properties, and also to Kelley and Sowerwine, that the Saco bonds be bought up in the American market. Since the Anaconda officials declined to do so with the funds under their control, Schulte suggested "some independent outsider, presumably a European." Kelley consented to this provided the funds to be used would otherwise be due to Saco from Erben. Schulte then consulted with La-Roche and Company, representing a Swiss bank syndicate, and concluded an agreement under which Erben was granted an option to buy, at a profit to the Swiss banks, any Saco bonds which they might purchase. But the Swiss banks preferred to use German funds for the buying, and so it was agreed that a German-owned balance must be set up in Switzerland. For this purpose Erben consented to ship zinc into Switzerland to Erzag Aktiengesellschaft—called

Erzag—which was a Swiss corporation organized by LaRoche and previously used exclusively as an instrumentality for handling Erben's Swiss finances. Erzag was to resell the zinc and retain the proceeds for use in buying the American bonds. It was to be Schulte's business to procure the necessary licenses from the German Government.

Apparently on the theory that future repatriation of the Spolka properties was desirable for Germany, and further that this could not be done unless the outstanding American-held bonds were first retired, Schulte convinced the German authorities that the proposed Erben-Swiss bank scheme should be exempted from the Swiss-German wartime clearings. The Swiss also agreed, because they needed zinc. Thus it was that between September, 1940, and March, 1941, 10,000 tons of zinc were shipped to Erzag, and the proceeds exempted from the clearings on an explicit understanding between the Swiss banks and the Swiss Compensation Office that those funds would be used to purchase American-held bonds. And the Swiss banks began buying Saco bonds in the name of the Union Bank of Switzerland. By March, 1941, they had accumulated bonds in the face amount of $640,000 for an outlay of about $430,000. But the market rose with these purchases, and when the profit margin to the Swiss banks became too small they stopped buying. All this apparently was done without the knowledge of the Anaconda officials; Sowerwine even wrote to Schulte to remark on the sharp rise in the market price, saying, "We are greatly at a loss to know who is buying these bonds." Subsequently he was told, but he could not at once find out from Schulte for whose account they were being bought.

When Kelley and Sowerwine were finally apprised of the repatriation scheme they approved. They then entered into an agreement with a representative of one of LaRoche's subsidiaries, Internationale Kapitalanlegen Gesellschaft—called Ikap—which provided that Saco's assets would be transferred to either LaRoche or Ikap. Voting trust certificates for all of Sihoc's capital stock available to Anaconda would be transferred for $6.85 per share; in addition, LaRoche was to lend Saco $2,200,000 with which to retire all of Saco's outstanding bonds, including those then held by the Union Bank.

On the Swiss-German side, these developments were reflected in an agreement providing that the Swiss banks would advance Sw. Frs. 25,000,000 to be used to purchase the Saco and Sihoc paper; and zinc shipments would continue to Erzag to provide the funds with which to repay the loan. It is pretty clear that at this time Schulte contemplated the application of some of these funds to the reduction of Erben's old indebtedness to the Swiss banks. This was necessary because otherwise the Saco minority stock pledged with the Swiss banks could not be redeemed, and the repatriation scheme might fail.

Though the Anaconda officials were ready to go through with the plan in May, 1941, Swiss paper work held matters up beyond June 14, 1941, when the Presidential freezing order was extended to Switzerland. This subjected the transactions to United States Treasury Department scrutiny and approval. Through a series of elaborate contracts executed on June 20, 1941, the Swiss attempted to divest the transaction of its apparent German tinge. Without relating details it may be said that much of this paper work does consist of changing the parties around by making use of Erzag, the instrumentality of the Swiss banks for handling the Erben activities, and of "Non-Ferrum," to use the parties' designation of a longer named Swiss corporate instrumentality of Erben's.[4] One important change was, however, effected by what may be called the "Consolidation Contract," also of June 20, 1941, to the effect that the old as well as the new debts of Erben to the Swiss banks should be thrown into the same hopper and be made realizable in the same way.

4. Non Ferrum Gesellschaft zur Finanzierung von Unternehmungen des Bergbaues und de Industrie der Nichteisenmetalle.

It was therefore perhaps not surprising that the application to the Treasury Department for permission to make the necessary transfers was refused on July 26, 1941. Since it was then obvious that Saco must default on its bonds on August 1, the reorganization petition followed. Then, in August, the reorganization trustees joined in a new application to the Treasury Department presenting the essential difference that now the Saco and Sihoc paper was to remain on deposit in escrow until the Treasury Department approved of its transfer. This application was also denied. There then appeared a threat that the German Government might stop the metal shipments which it had approved as a means of accumulating German funds in Switzerland to carry out the new jeopardized arrangements. Such a course would also upset the new plan of the Consolidation Contract of June 20, 1941, to apply these proceeds to the old Erben debts as well as the acquisition of the Saco bonds. So a third application to the Treasury Department was made on December 12, 1941, which omitted all transfer of Sihoc stock and contemplated only the redemption of the Saco bonds through the offices of a loan. But this also was refused.

Just before the final refusal by the Treasury, Schulte and Siemon had reported to the German Ministry that the proposed loan had actually been granted. They relied on a letter from LaRoche of the Swiss banks to Non-Ferrum which so stated, explaining that the step was necessary because Saco was in bankruptcy and its common stock held by the Swiss banks as collateral might otherwise have become worthless. The record shows that Schulte and Siemon continued for several months thus to deceive the German Ministry. This is probably the only reason why the metal shipments to Switzerland were continued. When they were finally terminated upon the Polish seizure of the mines, the total net proceeds accumulated since 1940 amounted to Sw. Frs. 25,538,667, or about $6,000,000. A report made on September 21, 1949, by Price, Waterhouse & Company indicates that of this sum Sw. Frs. 6,685,-252, or about $1,500,000, represents profits derived from the sale of more than 9,000 metric tons of metals extracted from the Spolka mines. It is this money which, in the view of the appellants, surely belongs, in the nature of things, to the debtor.[5]

Two other matters must be mentioned in connection with the Swiss banks. First, Dr. Schulte, without the knowledge of his associates in Erben or the authorities, concluded an arrangement on August 21, 1942, with the Swiss interests which provided for the transfer of Erben's interests, here involved, to Erzag and Erzag's assumption of Erben's obligations in the premises.[6] Most of this contract, even if it was valid and possible of performance, has not been performed and it appears to have been, as the trustee's expert on Swiss law commented, "a dubious instrument in different respects." The second is the seizure on November 17, 1942, by the United

5. The S. E. C. urges claims also to other funds, including the Erzag fund of Sw. Frs. 7,241,600, or around $1,700,000 exclusive of the $640,000 of Saco bonds, built up by a loan from the Banks for the purpose of retiring the Saco bonds, as well as the amounts needed for the purpose from the larger six million dollar fund, since the Banks have received sums in excess of $3,000,000 in the form of payments of interest and principal upon their repatriation loan and their prewar loans.

6. The agreement provided that Erben was to transfer to Erzag all of the capital stock of Non-Ferrum and another Erben subsidiary, whatever Saco stock was held by Non-Ferrum, Erben's mines in Upper Silesia, all claims to the metal proceeds, a mortgage of 20,000,000 gold marks on the Spolka realty, $54,000 of Saco bonds owned by Erben, and 19,965.6 English pounds on deposit to Erben's credit with an English firm. Erzag in turn was to assume certain of Erben's obligations, viz: (1) settlement of the obligations incurred by Erben to Spolka, Saco, and one of Erben's subsidiaries; and by Spolka to Saco (it being contemplated that this would be done when Erzag and LaRoche acquired the American stockholdings); (2) liquidation of the obligations incurred to the Swiss banks under the repatriation scheme and the loans made to pay the debt to Saco; (3) the burden of Erben's obligation as surety on a loan of Sw. Frs. 2,500,000.

States Alien Property Custodian of the Saco minority stock pledged by Erben as collateral with the Swiss banks. While these banks did not contest the matter, it was bitterly opposed by Saco and Sihoc all the way to the Supreme Court through the means of a request for instructions from the Bankruptcy Court as to whether or not Saco must issue new stock certificates to the Alien Property Custodian. The decision in the affirmative was based on an interpretation of the Trading with the Enemy Act, as amended by the First War Powers Act of 1941, and expressly refrained from a decision as to the effect of the order and the judgment below upon the claims of the Swiss banks as pledgees of the stock. Silesian American Corp. v. Clark, 332 U.S. 469, 68 S.Ct. 179, 92 L.Ed. 81, affirming Silesian-American Corp. v. Markham, 2 Cir., 156 F.2d 793. Thus one of the obvious purposes of the secret agreement of August 21, 1942, purporting to transfer the Saco stock to the Swiss banks outright, failed.

The position of the Swiss banks, then, may be summarized as follows: directly or through an instrumentality they hold substantial proceeds from sales of zinc acquired from a vendor (Erben) whose right to it in the first place has not been established. With these funds or bonds acquired therewith the banks appear to seek, with a fair likelihood of attaining, both control of the new company and ultimate reimbursement of extensive old and new claims against Erben. These fond hopes might be realized by (1) participation in the plan by the Saco stockholders so that if the Attorney General, as successor to the Alien Property Custodian, might ever be divested of the Saco shares then the banks could claim outright ownership and participate accordingly, or (2) the banks' outright participation on the basis of the Saco bonds acquired with the proceeds of the zinc sales. At any rate they have offered through their attorneys to contribute (1) $657,280 in cash, (2) the debtor's bonds, in the principal amount of $640,000, held by Union, one of their number, and (3) the 10% distribution which has already been made on the outstanding bonds, amounting in this case to $64,000. This offer is conditioned, how-

ever, on the acceptance of a plan which will discharge them from all threats of future liability in Saco matters. Since the trustee's plan accomplishes just this result, it must now be considered.

*The trustee's plan of reorganization.* The plan as amended is built upon acceptance of the Swiss banks' proposal, which carries with it their release from all claims by the debtor, the trustee, and the bondholders. Insolvency is assumed and the preferred and common stockholders do not participate. There is thus made possible an immediate distribution of $390 upon each $1,000 bond (now of the face value, with the accrued unpaid interest, of about $1,600). Provision is also made whereby these bondholders may participate with the Swiss banks, under certain conditions, in future collections which may be made by the revamped corporation. And a substantial measure of control of the latter is given to these banks by various provisions, including the device of a ten-year voting trust.

More in detail the plan provides for the issuance by the reorganized corporation of four types of obligations: two groups of 4% participation certificates for the benefit of the bondholders and the Swiss banks, with certain priorities established among them; a group of 4% unsecured, non-negotiable deferred payment notes for the debtor's unsecured creditors, with payment deferred until all principal and interest is paid on the first two groups; and 36,310 shares of no-par common stock, to be deemed fully paid and non-assessable. The first participation certificates are to be issued to the Swiss banks to the amount of $657,280 (their immediate cash contribution under their offer), and to the bondholders in the amount of $2,087,825, the amount now outstanding to individuals. The second participation certificates are to be issued to the Swiss banks in the amount of $1,065,600. Any sums received by the indenture trustee named according to the plan are to be applied "on a pro rata basis and in the following order," *viz.*, first interest and then principal upon the first group, followed by interest and then principal on the second group. Of the voting trust certificates representing the common stock, one-half go to

the Swiss banks—or to a domestic corporation to be organized by them to represent their interests; the other half go to the bondholders in the ratio of ten shares for each $1,000 bond otherwise held.[7]

Under the plan the voting trust would have three trustees, two selected by the court and one by the Swiss banks, who would in turn elect annually the proposed five-man Board of Directors. Of these, three would be selected by the voting trustees designated by the court, and the other two by the voting trustee representing the Swiss banks. The first Board of Directors would consist of three men representing the First Certificates, to be appointed by the court, and two men representing the Swiss banks, to be designated by the Swiss banks with the approval of the court.

The reorganized company may not accept any compensation from the Polish Government on account of the nationalization claim unless it is sufficient to pay all principal and interest on both groups of participation certificates. This provision may in effect be waived, however, by agreement of the holders of 60 per cent of the aggregate amount of first and second participation certificates. But in no case will a settlement with the Polish Government be valid unless agreed to by the holders of a majority of the common stock.

The reorganized company may borrow money on a long- or short-term basis, subordinating all payments on the participation certificates to repayment of any such loan or the interest on it. Repayment thereof may be made only with (1) funds of the loan not used, or (2) money otherwise applicable to payments of principal or interest on the participation certificates. But the reorganized company need not use money so borrowed, or working capital, to pay principal or interest on the participation certificates. Working capital is to be between a minimum of $50,000 and a maximum of $100,000.

The common stock cannot receive dividends, nor may the reorganized company

buy or retire it, until all participation certificates have been retired. The nonpayment of interest on participation certificates is not to be considered a default. The company cannot issue nonvoting stock. When the first and second participation certificates have been retired, and the debtor's assets consist solely of securities and cash, the reorganized company is to be dissolved with proceeds to the stockholders *pro rata.*

Through their proposed domestic instrumentality, the Swiss banks are to transfer to the indenture trustee (1) $657,280 in cash, (2) the debtor's bonds held by the Union Bank of Switzerland in the principal amount of $640,000, and (3) the $64,000 cash distribution already made on the latter. When this is done the Swiss banks will receive their first and second participation certificates. Their representative company may liquidate at any time, but is forbidden to transfer its interests to a German company. Under the plan, therefore, the Swiss banks would receive (1) $657,280 principal amount of first certificates, (2) $1,065,600 principal amount of second certificates, and (3) voting trust certificates for 18,155 shares of the common stock.

The $640,000 principal amount of bonds held by the Union Bank of Switzerland is not to participate in the cash distribution to be made on consummation. The $54,000 worth of Saco bonds held by Erben will be cancelled as a partial set-off of the debt due Saco from Erben. Of these, $40,000 is now held by the Alien Property Custodian, together with the Saco common stock referred to above. The $4,000 (10%) cash distribution already made on these bonds is to be recovered from the Alien Property Custodian by suit, and the similar distribution contemplated on the other $14,000 worth will not be made. The unsecured creditors are to receive a 10% cash payment on their allowed claims, and the 4% unsecured, non-negotiable, deferred payment notes for the balance. And, as

7. The various figures given assume consummation prior to August 1, 1950. There are provisions for accrual of interest after that date which will cause some

modification of the detailed figures, but not materially alter the general structure of the proposed plan.

will have appeared, the total amount to be received upon a $1,000 bond—without counting increased participation necessitated by the passage of time prior to the adoption of the plan—will be (1) $390 in cash, (2) $1,150 principal amount first participation certificates, and (3) voting trust certificates for ten shares of common stock.

All of the appellants attack the plan with the utmost vigor, though their grounds naturally differ as their interests vary. They all agree in condemning the offer of the Swiss banks and urging that these be sued; the debtor urges suit against Erben as well. As to suit against the promoters, that is naturally not favored by the debtor and Sihoc, though it is by the others. The debtor and Sihoc urge the possibility of solvency if the suits they favor are brought, labeling the plan as premature or unfair to the debtor's present stockholders otherwise. The Attorney General, relying on the reasons advanced by the S. E. C. for holding the plan unfair, also urges that acceptance of the Swiss offer and its execution would constitute a violation of the Trading with the Enemy Act. There seems also general agreement with the position of the Protective Committee that because of their peculiar interest in the outcome the Swiss banks should be placed in a category apart from the others in interest for the purpose of voting upon acceptance of the plan.

The position of the S. E. C. should be stated more at length, both because of its statutory responsibility and because of the thoroughness with which it has worked out its position. The Commission holds the plan unfair and inequitable because:

1. It fails to embody the possibility of a sizable recovery from the Swiss banks of the proceeds from zinc shipments originating at the Spolka properties; moreover, the proposed large participation of these banks in the new company is utterly without equity, since their offer is not a real compromise at all, but merely a part of their bidding for control of the new company with assets rightfully belonging to the debtor.

2. It does not contemplate a suit against the promoters, Harriman and Anaconda, to make them refund dividends received, as well as the $400,000 which they charged Saco in promoters' fees, and provide cash for the $7,000,000 in Saco preferred stock which they received without apparent consideration.[8]

3. It does not provide for the issuance of contingency certificates which would allow Saco's stockholders to share in any recovery from the Polish Government. This is urged as necessary because the case presents unusual facts which make the finding of insolvency on the part of the debtor virtually meaningless for the purpose of this reorganization. The issuance of these certificates would, however, be conditioned on the payment by any recipient of the par value of any stock which he might hold and for which value had not been given before.

4. It disenfranchises the public bondholders through the device of the proposed voting trust whereby the members of the trust are selected by the court and the Swiss banks.

5. It is unfeasible, since not enough working capital is provided to enable the new management successfully to press contingent claims against anyone.

In general response the trustee expresses concern at the long continuance of the reorganization proceedings, now in process for nine years, without substantial gains for the bondholders or even payment of administration expenses; and he asserts that he alone of those before us really speaks for these claimants, since the Protective Committee represents only holdings too small to be fairly representative of the entire group. He has thoroughly convinced himself of the lack of substantial value of any of the potential claims. In

8. It should be noted that Sihoc finds the value behind the block of preferred stock also in the Erben transfer of Spolka properties which support the other Saco securities, urging that this course was necessary because of Polish insistence upon American control if the tax levies were to be waived. The S. E. C. counters by saying that control would go with the common stock alone, without need for the additional preferred stock issue.

this he relies heavily on the opinion he obtained from an expert in Swiss law to the effect that there is little or no possibility of any recovery against the Swiss banks. Further, his counsel has pressed investigations in Switzerland and here, too, with the same consequence; and he fears that further litigation will only sacrifice the substantial benefit he is convinced he is now offering the bondholders.

*Fairness of the plan.* The principal difficulty in this case is that we do not know the precise value of the debtor's estate because its largest potential assets consist of rights of action. The debtor's claims are against four other parties: (1) the Swiss banks, for the proceeds of the zinc sales, earmarked for the retiring of the Saco bonds; (2) Erben, for the zinc mined from Spolka properties during the German occupation; (3) the Polish Government, for compensation on account of the nationalization of the Spolka properties; and (4) Harriman and Anaconda, for return of promoter's profits, dividends received, and failure to produce value for the $7,000,000 in Saco's preferred stock. The matter is not helped by the fact that if the Polish Government ever pays the claim made against it, then Saco may be said retroactively to have been solvent all the while. Objections to the plan are naturally put in terms of its not being "fair and equitable, and feasible," as it must be to conform with the Bankruptcy Act §§ 174, 221(2), 11 U.S.C.A. §§ 574, 621(2). But we are being asked in fact to approve the decision of the trustee, acquiesced in by the court below, that for good reason the claims referred to above either cannot or should not be prosecuted in the courts because there is substantially no hope that they will be successful. This weighing of possibilities is an exercise of business judgment which the courts are not particularly fitted to make, but which under our legal system they cannot avoid. Approaching the issue with all due caution, we are compelled to find a lack of sufficient proof of the adequacy of the settlement proposed to justify acceptance of the plan as fulfilling the statutory standards. We have some sympathy with the trustee's concern as to the duration of the proceedings. It must be said, however, that only in very recent years has the issue really developed and the time spent in actual investigation of the claim has been relatively short—about a year and a half from its recognition to completion of negotiations settling the terms of the offer. Indeed, as the S. E. C. points out, the Swiss banks have been extremely uncooperative in divulging information; it may be safely assumed that they would have said a good deal less than they have if they had not thought it expedient to explain much of the correspondence relating to Swiss-Erben transactions which the Department of Justice uncovered in the files of the Reich Ministry of Economics. We feel that both as to the law and the facts further investigation is necessary before the substantial equities against the Swiss banks can be dismissed with the payment they offer—a payment too substantial to suggest the absence of a legal ground of claim, but too small to be a fair compromise of a just dispute.

The difficulties of appraisal are illustrated by the state of the record on the very important questions of Swiss law here involved. Even though the trustee relied heavily on two opinions written on the basis of assumed facts by an expert in Swiss law, it did not produce him or his opinions in court and the latter appear only because they were introduced by an objector in an endeavor to prove the limited character of the trustee's investigators. The appellants complain bitterly that they had no opportunity to examine and cross-examine. Even though this may not be technically necessary in view of the court's power to take judicial notice of foreign law, N.Y.Civil Practice Act § 344-a, Fed. Rules Civ.Proc. rule 43(a), 28 U.S.C.A., yet it would seem clear that there should have been further evidence, from this expert or from others, before too final conclusions were to be ventured. The S. E. C. asserts, with much force, that the facts assumed were altogether too scanty and scattered to justify the expert's conclusion against any and all action, that more facts have already come to light, and that more should be sought out before such a conclusion can be

accepted. Moreover, the expert's opinions on their face suggest very definite questions. We do not intend to discount the expert's opinions too extensively; on the record he would appear to be a man of parts, aiming to provide a complete and detached view. But he appears to have been affected by the defeatist point of view—which the truestee had [9]—so much so that he convinces himself at the start of the danger of government confiscation of the funds and then says: "Once established that the Swiss Compensation Office will take over in all probability the zinc proceeds funds, if the parties bring a law suit in court it is of little value to analyze the rights of the parties under private law."

This position seems to us quite inexplicable. The apparent assumption is that if the Swiss Compensation Office finds out from litigation what is going on it will descend upon the Swiss banks, remove the zinc sale proceeds from them, and apply the confiscated funds to the German deficits in the Swiss-German wartime clearings. This is supposed to follow because the Swiss banks are not using the money as they agreed with Erben—to buy up Saco's bonds held by Americans. Thus after a long discussion of the arrangement providing for the banks' acquisition of the American bonds, the expert says: "So the banks get out of this transaction in SACO securities an amount of money that is in fact a partial repayment of their [old] credits, although normally no repayment would be possible under Swiss clearing law. The whole transaction, that looks like a new credit given to Erzag for the benefit of Giesche [Erben], is in fact a way to go around the provisions of the Swiss clearing

law." Assuming this to be fact (as it probably is), the position which the expert has attributed to the Swiss Compensation Office becomes absolutely unintelligible in the context of a suit by the trustee attempting to do nothing but make the Swiss banks live up to the very conditions on which their transactions were exempt from the clearings. On the equities in this case it is the Swiss banks, certainly not the reorganization trustee, who ought to fear that Office. In fact that Office appears to have been prepared to maintain its original position as late as July, 1946.[10] Doubtless it already knows much more about this case than we realize. At any rate this seems to us one of the matters about which we should know more. We do not see why a direct approach to the Government Office in question, as well as further attempts to secure information from the Swiss banks, should be ruled out. Moreover, in the present state of our information we do not see why we should attribute so strange and inconsistent a position as does the expert to a notably shrewd and friendly government.

Having adopted this basic postulate, the expert did go on to conclude that the banks were in an impregnable position for several reasons, chiefly revolving about the difficulty of tracing the thread of ownership among and between the several corporations which have figured in the picture and the lack of legal theory in the Civil Law of Switzerland to sustain recovery. Thus he rejects the theory of tracing the proceeds of the zinc and establishing a "constructive trust" in them, for lack of a concept of "trust" as understood in Anglo-American law,[11] plus the problem of trac-

9. And the expert had before him the trustee's tentative acceptance of the offer, together with the supporting opinion of the Banks' own expert.

10. When it required provisional surrender by Erzag of Sw. Frs. 2,153,226, since no agreement had yet been reached, but extended the time within which such an agreement might be executed and the funds released. The latest extension shown by the record appears to have been to around Dec. 31, 1947; still later history—including as a possibility of course

completion of this partial seizure—is cloaked in obscurity, due to the refusal of the Swiss banks to make disclosure of their relations with their government in this matter. That only a part of the funds were here involved seems to be because the Compensation Office appears to have considered the agreement already executed as to the other funds.

11. Compare, however, Professor Pierre Lepaulle's illuminating article, Civil Law Substitutes for Trusts, 36 Yale L.J. 1126.

ing if the Spolka ores were refined in Erben's German plants and then sold by Erben as its own. He rejects the theory of recovery by the trustee as a third-party beneficiary or in quasi-contract, since, as he concludes, Erben is the only party by whom the Swiss-Erben agreement for the purchase of American bonds was intended to be enforced. He believes that a tort suit must fail because the necessary proof will be lacking "that the defendant made intentionally an untrue statement, that by this statement the petitioner or plaintiff was induced in error and therefore committed or omitted acts which caused damages to him." And he appears to discard any American concept of "piercing the corporate entity," saying that the Swiss courts will not, for Saco's purposes, identify two corporations, of which one is the subsidiary of the other; thus, Non-Ferrum is not synonymous with Erben, or Erzag with LaRoche.

Though American lawyers must necessarily walk gingerly in the glades of the Civil Law, we do not find this as complete a demonstration of the absence of any claims against the Swiss banks as did the trustee; nor, as we suggest, apparently did the Swiss banks themselves. It does stress what indeed we all must know—that tracing funds among a series of intertwined corporations is a serious and painstaking task. Against that must always stand the persuasive force of the actual facts of identity if those facts do exist. Here the very convenient failure of the Swiss banks to disclose any important facts, except under pressure, lends added conviction to what the record already appears to show. As it stands, tracing of funds would seem possible and, if so, the expert's own rationale definitely supports recovery. Nor are we convinced that on the still scanty facts available all other theories of recovery are barred, and the expert's own qualifications of his conclusions suggest such possibilities upon the disclosure of more facts. It hardly seems to us conceivable that the rich admixture of tradition and practicality contained in the Swiss Civil Law should be wanting in a theory of recovery when the equities in favor of the suitor are as strong as we, as at present advised, believe them to be.

We may summarize these views by saying that, upon the facts so far disclosed, the equities in favor of the trust estate for the carrying out of the original agreements as to the Swiss deposits are very strong as against essentially no equities whatsoever in favor of the Swiss banks and in support of their proposed appropriation of any of these proceeds to their own advantage before complete payment of the American bonds. The obstacles to a recovery which would thus otherwise be a natural step for any court of justice are of two kinds, (1) the difficulties of tracing and of adequate legal theory and (2) the fear that the Swiss Government through its appropriate agency will seize the funds for failure of execution of the orginal plan. Unless better evidence is produced than we have here, we cannot attribute to the Swiss courts such lack of legal sophistication, nor to the Swiss Government such a cold-blooded exploitation of a failure of its citizens to perform their assumed obligations to American investors.

We therefore reverse the order approving the plan for lack of an adequate showing on this record that the adjustment with the Swiss banks upon which it is bottomed is fair or just, particularly in the light of what seems to us the strong indications to the contrary. And we remand the cause for such further proceedings below as may appear appropriate in the light of this opinion. We shall not attempt to prescribe what these should be. The plan may be withdrawn and another substituted; or action may be instituted either in Switzerland or, as the representative of the estate may be advised, here where all the present parties appear to agree there is jurisdiction; or the defects of fact and of foreign law of the present record may be supplied through commission issuing out of the court below for examination of foreign witnesses or otherwise, as may be determined. In any event there should be some detailed examination of (a) the present attitude of the Swiss Compensation Office to the execution of the agreements.

to retire the Saco bonds, (b) the negotia-. tions between this Office and the Swiss banks on this issue, (c) the relations down to date of the Swiss banks, Erzag, Erben, and all subsidiaries with reference to the Swiss deposits from the zinc sales, including the activities of the somewhat mysterious and certainly flitting Dr. Schulte,[12] and (d) the applicable Swiss law.

In view of this conclusion we need not determine finally the other issues in the case. Reversal of the order gives an opportunity for their reappraisal in the light of further evidence also as to them. As an aid to such appraisal, but not as binding admonition, we make the following comments:

We see nothing to challenge the finding that the claims against Erben for removal of Spolka ores are uncollectible in point of fact. The correctness of the decision not to sue Harriman and Anaconda is one about which we are somewhat divided in view; it must therefore be returned for further study without definite advice. It is clear that the promoters realized substantial profits, without large risk, from underwriting commissions, organizational fee, and dividends, together with the large stock issue to them; whether they are liable, as the S. E. C. charges, for a misleading bond circular, or write-up of Spolka assets or general overvaluation of the mine properties and possibilities, cannot be determined by us on the basis of this record. Finally, the suggestions of the S. E. C. as to the details of the plan, including the possibility of the issue of contingency certificates to those who have given value received for their security interest, would seem to have merit. Recovery, if ever had against the Polish Government, is not likely to turn upon the business skill of the new concern; rather the pro-

ceeds should go to those who have put value into the concern.

Reversed and remanded.

AUGUSTUS N. HAND, Circuit Judge, did not participate in the decision so far as it involves the Anaconda and Harriman interests; he concurs in the remainder of the opinion.

12. Various appearances of Schulte have been noted in the narrative above; he was long distrusted by Brooks, Spolka's American general manager, but trusted by other Anaconda officials, until he relapsed into silence as to the size of the wartime zinc shipments and the amounts which the Swiss banks had applied to pre-Erben obligations. More lately he has appeared in this country to promote a set-

tlement either on behalf of Erben or the Banks or both; after proving an unhelpful witness in these proceedings, he returned to Switzerland on his assurance that he would return to interpret and comment upon certain papers held by the Banks. He has since refused to return and the Banks have declined to assist or to produce the papers.