**CONWAY et al. v. UNION BANK OF SWITZERLAND et al.**

No. 174, Docket 22538.

United States Court of Appeals
Second Circuit.

Argued March 4, 1953.

Decided April 13, 1953.

As Amended on Denial of Rehearing
June 8, 1953.

604

Oliver T. Cowan, New York City, for trustee.

William Gilligan, New York City, for debtor.

Leonard P. Moore, Rowland F. Kirks, Asst. Atty. Gen., Myles J. Lane, U. S. Atty., Southern District of New York, James D. Hill, George B. Searls and John F. Cushman, Attorneys, Department of Justice, Chadbourne, Parke, Whiteside, Wolff & Brophy, New York City, for Attorney General and Silesian Holding Co.

George Zolotar, New York City, Roger S. Foster, General Counsel, David Ferber, Sp. Counsel, Securities and Exchange Commission, Washington, D. C., Arthur A. Burck, Kiva Berke, New York City, of counsel, for Securities & Exchange Commission.

Lawrence J. McKay, New York City, Cahill, Gordon, Zachry & Reindel, New York City, William W. Dulles and Dudley B. Tenney, New York City, of counsel, for appellees.

Before SWAN, Chief Judge, and L. HAND and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

These are appeals by the Debtor, its Trustee and several other interested parties from an order of the bankruptcy court, dismissing for lack of jurisdiction the petition of the Trustee in reorganization under Chapter X of the Silesian-American Corporation, against four Swiss banks, which for convenience we shall call collectively "The Banks." The petition alleged that "The Banks" had got possession of large quantities of zinc ore and of the proceeds from the sale of such ore, for which they were accountable to the Debtor and it prayed that they should be required to account. The transactions are extremely complicated, as appears from our former opinion upon an appeal from an order confirming a plan of reorganization; [1] but for the purposes of this appeal a much more summary statement will serve. In 1926 a German corporation, that we shall call "Erben," had sold to the Debtor all its interest in certain zinc deposits in Poland, the interest being in the form of shares in a Polish corporation, that we shall call "Spolka." In exchange for the "Spolka" shares the Debtor gave to "Erben" nearly half its own common, and over forty per cent of its preferred, shares. "Erben" borrowed largely from "The Banks," and as security pledged the shares in the Debtor that it had received in exchange for the "Spolka" shares. This took place in September 1939, shortly after which "Erben" was put into direct possession of the "Spolka" properties by the German occupation of Poland. "Erben" then arranged with "The Banks" for the shipment to them of zinc taken from the "Spolka" deposits, which "The Banks" either kept in kind, or sold under an agreement with "Erben" that the proceeds should

1. Conway v. Silesian-American Corp., 2 Cir., 186 F.2d 201.

be used to buy outstanding bonds of the Debtor, then selling at depressed prices. "The Banks" did buy $640,000 of these bonds which they held at the time of petition filed herein. "Erben" continued to ship zinc to "The Banks" and it was agreed that with the proceeds "The Banks" should continue to buy bonds and shares of the Debtor, as well as other securities issued by it. This effort was called a "repatriation" of "Spolka," apparently to indicate that the Polish deposits should go back into German ownership after "The Banks" had been paid their loans. After the bonds fell due on August 1, 1941, and the Debtor, being unable to pay them, went into this reorganization, "Erben" kept on shipping the zinc to "The Banks," with the proceeds of which, however, they were unable to buy bonds after June 14, 1941 because of a "freezing" order of our Treasury. In October, 1946, the bankruptcy court authorized the Trustee to pay a dividend of ten per cent upon the bonds, and "The Banks" signed and sent to the Central Hanover Bank and Trust Company a "Letter of Transmittal," directed to the Trustee's disbursing agent, the Guaranty Trust Company, accompanied by $640,000 of the bonds. This letter declared that the bonds were "presented to you for the purpose of receiving a partial distribution * * * as provided in an order * * * dated October 15, 1946"; and upon it the Central Hanover Bank received $64,000 to the credit of "The Banks." This money remained on deposit in the Central Bank to the credit of "The Banks" until March 30, 1951, when the Alien Property Custodian "vested" it in himself along with the bonds. On May 29, 1951, the Trustee filed a petition, reciting (1) that the order of October 16, 1946, under which the payment of $64,000 had been made had provided that it should not "constitute a waiver of any obligations, defenses, off-sets, grounds of subordination or cross-claims which may be asserted against any bondholders as to all of which, if any, full jurisdiction is reserved"; (2) that our opinion upon the earlier appeal had indicated "the possible

existence of claims" against "The Banks" that "might constitute a set-off or counter-claim against" the bonds; (3) that there were "complete offsets and counterclaims" to the bonds; and (4) "that the 10% distribution on the $640,000 of bonds should not be made until after such objections, defenses, offsets, grounds of subordination, or cross claims had been heard and determined." Upon this petition the Central Bank was ordered to repay to the Trustee the sum of $64,000 on June 27, 1951, and did so, and the Trustee still retains it.

On April 30, 1949, a plan of reorganization had been filed on which hearings were held, and which Judge Clancy approved on April 3, 1950; but which we disapproved in December 1950, upon the appeal already mentioned.[1] The chief reason for our disapproval was that we thought that the possibilities of recovery against "The Banks"—a release of which had been a condition of the plan—should be more thoroughly explored, in the hope that further examination might disclose that the chance of recovery was better than appeared from the record then before us. Apparently nothing of consequence took place after our decision until May 25, 1951, when the Trustee filed a petition praying that "The Banks" should file all claims against the Debtor that they might have of any sort whatever, or be barred from any share in the assets. (The petition also asked relief of a somewhat similar sort from "Erben"; but with this the present appeal is not concerned.) The grounds stated were that the bonds were "either the property of the Debtor or are claims against the estate of the Debtor to which there are complete offsets or counter-claims"; and that "it is necessary that persons claiming to have an interest in the bonds * * * be required to file a proof of claim, in order that the Trustee may know what other claims" (than his own) "are asserted with respect to the said bonds." The petition also alleged that "The opinion of the United States Court of Appeals * * * indicates the possible

[1] Conway v. Silesian-American Corp., supra, 186 F.2d 201.

existence of claims" against "The Banks" "which might constitute a set-off or counterclaim against the $640,000 bonds, should it be determined that the Swiss Banks or Erzag have an interest in said $640,000 bonds." ("Erzag" was a corporate agent of "The Banks," which is not before us on this appeal.) Finally the petition alleged that the Alien Property Custodian recently had "vested" the bonds in himself under the Trading with the Enemy Act, 50 U.S.C.A.Appendix, § 1 et seq.; as he had (although this the petition did not allege) also "vested" the shares, common and preferred, in the Debtor, issued to "Erben" for the "Spolka" shares. The petition concluded by praying that "any party or claimant failing to file a proof of claim within the time to be fixed shall be barred from participating in any way in the assets of the Debtor, or under any reorganization of the Debtor with respect to said bonds."

"The Banks" were given notice of this petition, but did not appear; and on June 27, 1951, Judge Clancy passed an order, requiring them and all others interested to file their claims on or before September 15, 1951; and declaring that, if they failed, they should "be debarred from participation in any way in the assets of the Debtor or under any reorganization of the Debtor." "The Banks" filed no claim of any kind; and on December 27, 1951, the Trustee filed a voluminous petition, seeking recovery against them for their conversion of the zinc that "Erben" had delivered to them and for other wrongs against the Debtor. Notice was given to "The Banks" of this petition also, which they did not answer, but, instead, on February 27, 1951, moved to dismiss it on the ground that the court had never had such personal jurisdiction over them as would support a counterclaim; and that, if it ever had had, the "bar order" of June

27, 1951, had ended it on September 15, 1951, by their failure to file any claims. This motion came on to be heard before Judge Clancy, who dismissed the petition on June 17, 1952; and the appeal before us is from his order.

We agree with the Trustee that "The Banks" had made themselves parties to the reorganization proceeding. Indeed, we cannot see what more was necessary than the claim they had made in 1946 to the dividend of ten per cent, and the receipt of $64,000 by the Central Bank. There can be no more definitive act making one a party to a proceeding to distribute the assets of an insolvent among its creditors, than to claim and actually to receive one's proportional share in a distribution of its assets. That is precisely the purpose of such a proceeding and all that any creditor can get out of it. "The Banks'" only answer is that their claim was not in the form prescribed by § 57, sub. a of the Bankruptcy Act,[2] by General Order 21(1), 11 U.S.C.A. following section 53, and by the local rules of the Southern District of New York. We may assume that these irregularities would justify the Trustee's returning the claims, and compelling "The Banks" to amend them; but that does not mean that no claims had been filed. Ever since Hutchinson v. Otis, Wilcox & Co., 1903, 190 U.S. 552, 555, 23 S.Ct. 778, 47 L.Ed. 1179 it has been a common-place in bankruptcy that a claim may be amended to conform to the required formalities, provided the "cause of action" is the same,[3] and this Circuit has been especially liberal in applying the doctrine.[4] Judge Clancy reserved any explicit ruling on the point; but he nowhere indicated an opinion contrary to what we are saying.

As we have already said, the only interest of a creditor or shareholder in an insolvency proceeding is to recover his

2. § 93, sub. a, Title 11 U.S.C.A.

3. In re G. L. Miller & Co., 2 Cir., 45 F. 2d 115.

4. In re Roeber, 2 Cir., 127 F. 122; In re Kessler, 2 Cir., 184 F. 51; In re Kardos, 2 Cir., 17 F.2d 706; In re Marshall's Garage, 2 Cir., 63 F.2d 759, 763; In re Lipman, 2 Cir., 65 F.2d 366; In re International Match Corp., 2 Cir., 69 F.2d 73, 74; In re Gordon, 2 Cir., 90 F.2d 583, 585; In re High Point Seating Co., 2 Cir., 181 F.2d 747, 749, 750; Schwartz v. Mills, 2 Cir., 192 F.2d 727, 730.

share of the assets, but by intervening he naturally exposes himself to every defence that the insolvent may have to his claim, including set-offs or counterclaims; however uncertain it was before the Supreme Court so held in 1935 whether he also exposed himself, not only to an extinction of his claim, but also to an affirmative recovery under a counterclaim.[5] That case did so decide, and we assume therefore that the notices served under the Trustee's petition of December 27, 1951 would have been an equivalent of personal service upon "The Banks," if at that time they had been claimants, as creditors of the Debtor; but we think that they had ceased to be such claimants before the Trustee's petition of December 27, 1951 was filed, and that it was no longer possible to obtain jurisdiction *in personam* over them. The order of June 27, 1951 was directed specifically to them; and it covered every conceivable interest they might have in the Debtor as appears from the following extracts. It required them "to assert in this proceeding on or before September 15, 1951, any and all claims of whatever character against the Debtor, or its property * * * and any and all interests in the Debtor, and any and all claims to, or interests in, any of the assets, property or effects belonging to the estate of the Debtor"; and, if they failed to file the prescribed claims "with respect to" the bonds, not only were they to "be barred from participating in any way in the assets of the Debtor, or under any reorganization of the Debtor with respect to said bonds," but they were to "be barred from participation in any way in the assets of the Debtor, or under any reorganization of the Debtor." Although this language did not specifically mention any possible interest in shares of stock in the Debtor (perhaps because these had long since been "vested" in the Alien Property Custodian), none the less it expressly covered any claims to such an interest. Moreover, the order also covered the dividend of $64,000, for as we have seen, it was ordered repaid to the Trustee on the same day that the "bar" order was signed, and the Trustee must have received it before September 15th. The scope of the order was therefore plain: it meant to shut out "The Banks" from any share of any kind in the Debtor's assets, or from any "participation" in the reorganization, unless they filed their claims.

"The Banks" insist also that by December 27, 1951, they had lost any interest they had ever had in the assets of the Debtor, and that on this account, as well as because of the "bar" order, the District Court had no jurisdiction over them under the counterclaim. We answer that under the doctrine of Alexander v. Hillman, supra, 296 U.S. 222, 56 S.Ct. 204, it does not matter whether the creditor's claim is valid; the only relevant inquiry is whether he is a claimant, when the counterclaim is filed. The theory is that by becoming a claimant he subjects himself, not only to an extinction of his claim, but to an enforcement of any counterclaim in its entirety; and the justification for this is reasonably apparent. It is common ground that the counterclaim may be used as a setoff against the claim, and that involves a decision upon its merits. If, however, it did not also involve its enforcement in full, the Debtor would be forced to split his claim, recovering enough of it in the insolvency proceeding to cancel the claim, but being obliged to seek out the creditor where he could get personal jurisdiction over him in order to recover the remainder. Since the decision in the insolvency proceeding would conclusively settle all the facts, to insist upon an independent action would do nothing more than to raise a formal obstacle to the collection of a claim, already adjudicated. For this reason it is not necessary to decide how far the "vesting" orders of the Alien Property Custodian had already extinguished "The Banks'" claims when on September 15, 1951, the "bar" order put an end to them. Indeed, it is plain that, at least to the extent of $64,000 (the dividend that the Trustee was then holding) there was an undetermined claim, and that would have

5. Alexander v. Hillman, 296 U.S. 222, 56 S.Ct. 204, 80 L.Ed. 192.

been enough, had it not been dismissed before December 27, 1951. Therefore, this appeal turns upon the effect of the "bar" order.

■ A creditor does not require the order of a court to become a party to a reorganization proceeding; but he does require one to withdraw his claim. Even before General Order 37 had applied the Federal Rules of Civil Procedure, 28 U.S. C.A. to proceedings in bankruptcy, we had held [6]—and the Supreme Court had affirmed the ruling [7]—that it was proper to resort to a local rule of the district in determining whether the court must give leave to a creditor, when he seeks to withdraw. We are now to look to Rule 41(a), which also the General Order makes applicable, and which governs voluntary dismissals. We will assume *arguendo* that subdivision 1 (i) of that rule does not apply, for a trustee in bankruptcy does not need to file an answer in order to put a creditor's claim in issue; but subdivision 2 does apply, which empowers the court to impose upon withdrawals such "terms and conditions" as it thinks "proper." True, there is an absolute bar to withdrawal in the case of a counterclaim, but that is only if it "has been pleaded by a defendant prior to the service upon him of the plaintiff's motion to dismiss." Therefore, even though we were to accept the appellants' argument that the failure of "The Banks" to file any proofs of claim before September 15, 1951, was equivalent to a voluntary dismissal of their claims, it was none the less an effective dismissal; for at worst, the "bar" order finally disposed of their claims as much as an order would have done that granted them leave to dismiss. No counterclaim had been pleaded, as in Kelso v. Maclaren, 8 Cir., 122 F.2d 867, and the fact that the Trustee might have one was certainly not the equivalent of "pleading" one, as we held in Kleid v. Ruthbell Coal Co., 2 Cir., 131 F.2d 372.

Moreover, it would be absurd to construe the "bar" order as though it merely gave "The Banks" leave to withdraw: it had quite a different purpose. They had, indeed, become parties to the proceeding by asking for and receiving the dividend, and perhaps also by other acts of intervention; but they had filed no proofs of claim in due form, and, not only was it the duty of the court to "prescribe the manner in which and fix a time within which the proofs of claim * * * may be filed and allowed"; [8] but it was also proper for the Trustee, if it was not indeed his duty, to procure such an order. That the "bar" order was passed in conformity with that section is not only implicit in what it provided, but appears from the fact that it concluded with a reservation that claims other than "The Banks'" must be filed at future times to be fixed, pursuant to § 174 of the Act.[9] An earlier day was "fixed" for "The Banks'" claims, apparently because the Trustee expected a conflict that he wished to have out of the way before any hearings on a plan which should be held under §§ 169 or 170.[10] Thus, the "bar" order put an end to any further participation by "The Banks" unless they chose to conform to the terms imposed. Certainly that was not the grant of leave to withdraw; but a conditional termination of their rights.

■ There is nothing to justify the position that the Trustee reserved any privilege to file a counterclaim after he had put an end to the claims. True, he had suggested that he might have some; but, so far as appeared, he meant them defensively. But, whatever he meant, he gave nothing that could be deemed a warning of any reservation. Besides, he had extinguished the claims and that he had no right to do if he meant to press a counterclaim, because

---

6. In re J. R. Palmenberg Sons, 2 Cir., 76 F.2d 935; In re Steinreich Associates, 2 Cir., 83 F.2d 740.

7. Bronx Brass Foundry Co. v. Irving Trust Co., 297 U.S. 230, 56 S.Ct. 451, 80 L.Ed. 657.

8. § 596, Title 11 U.S.C.A.

9. § 574, Title 11 U.S.C.A.

10. §§ 568 and 570, Title 11 U.S.C.A.

"The Banks" were entitled to use them for whatever they were worth, as setoffs. As the record stands, having put an end to them without consideration of their merits, he wishes now to recover the full measure of recovery on a counterclaim, over which he can get any jurisdiction whatever, only because it is relevant in the liquidation of the claims. It is impossible to conceive a more absolute inconsistency in legal theory. Whether it will be possible to vacate the order of June 27, 1951, and revive whatever claims it put an end to, we need not say. "The Banks," having been finally dismissed from the proceeding, it may be now no longer possible to vacate the "bar" order and thereby to reassert personal jurisdiction over them. We decided in Grand Union Equipment Co. v. Lippner, 2 Cir., 167 F.2d 958, 961, that Rule 60(b), Fed. Rules Civ. Proc. did not apply to bankruptcy orders, with the possible exception of "orders affecting third persons, or perhaps denying discharge." Following that ruling, we now say that it is not too late—so far as concerns only the continued jurisdiction of the bankruptcy court—for Judge Clancy to entertain a petition by the Trustee to vacate the order of June 17, 1952, dismissing the Trustee's counterclaim, and also the order of June 27, 1951, conditionally dismissing "The Banks'" claims, and to reinstate them in the position they were in on June 27, 1951. The grant of any such petition will, of course, rest in the discretion of the court; moreover, it must be understood that we indicate no opinion as to whether, if he should so reinstate the "Banks," the bankruptcy court would regain any personal jurisdiction over them that was lost on September 15, 1951. That is to say, we indicate no opinion whether, personal jurisdiction having once been lost, the doctrine of New York Life Insurance Company v. Dunlevy, 241 U.S. 518, 36 S.Ct. 613, 60 L.Ed. 1140, will permit it to be regained by an order of the kind we mention. All we now decide is that, since the "bar" order had not been vacated on or before December 27, 1951, the dismissal of the counterclaim on June 17, 1952 was right, and that order must be affirmed.

Order affirmed.