**SILESIAN-AMERICAN CORPORATION et al. v. MARKHAM, Alien Property Custodian.**

No. 225, Docket 20121.

Circuit Court of Appeals, Second Circuit.

July 3, 1946.

Writ of Certiorari Denied Oct. 14, 1946.

See 67 S.Ct. 87.

Leonard P. Moore, of New York City (William Gilligan, of New York City, of counsel), for appellants.

James L. Morrisson and John F. Sonnett, Asst. Atty. Gen., John F. X. McGohey, United States Atty., of New York City, and Harry LeRoy Jones, and M. S. Isenbergh, Sp. Assts. to Atty. Gen. (Raoul Berger, General Counsel to Alien Property Custodian, of Washington, D. C., of counsel), for appellee.

Thomas A. McGrath, of New York City, for debtor, Silesian-American Corporation.

Chadbourne, Wallace, Parke & Whiteside, of New York City, for Silesian Holding Co.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

The Silesian-American Corporation, a debtor in a reorganization under Chapter X of the Bankruptcy Law, appeals from an order of the Bankruptcy Court, 11 U.S.C.A. § 501 et seq., answering its petition for instructions whether to comply with a demand made upon it by the Alien Property Custodian. The controversy arose over shares in the debtor which stood in the name of a Swiss corporation, but the certificates of which were held by certain Swiss banks as pledgees. The Alien Property Custodian, on November 17, 1942, passed a "vesting order" by which he "vested" in himself these shares of stock based upon a finding that, although they were "owned" by the Swiss corporation, that corporation "held" them "for the benefit of * * * a German corporation"; and on this account they were property of "a national of a designated enemy country." He also determined "that to the extent that * * * such nationals are persons not within a designated enemy country the national interest * * * requires that such persons be treated as nationals of the aforesaid designated enemy country." The Custodian served this order upon the debtor on January 18, 1943, and on February 12th, made a demand upon it to cancel the shares on the debtor's books, and "to issue in lieu thereof new certificates in the name of 'the Alien Property Custodian.'" Not wishing to comply with this order, because it feared that it might not be protected against the registered shareholder, and particularly against the pledgees, the debtor applied to the Bankruptcy Court for instructions. The Swiss banks appeared at the hearing and opposed the demand of the Custodian; they also announced to the debtor their intention of holding it and its trustee personally responsible for any action which either might take to their prejudice. On October 30, 1945, the judge directed the debtor to cancel the shares upon its books and to issue new certificates in equal amount to the Custodian. The debtor has appealed from this order, but the Swiss banks have not.

The debtor has no interest in the controversy, legally recognizable, except to be protected against any claims by the pledgees, or by the Swiss corporation in whose name the shares are registered. It has no standing vicariously to assert against the claims of third persons, the interests of those who may appear on its books to be its shareholders; and our inquiry may therefore be confined to whether § 5(b) (2) of the Trading with the Enemy Act, 50 U.S.C.A.Appendix, § 5(b) (2), provides protection for the debtor. (In all that we say we mean to leave unanswered the question whether the pledgees were bound by their appearance in the district court.) The difficulties arise from the amendment in 1941 of § 5(b) of the Trading with the Enemy Act. Until that time § 7(c) was the only provision which gave power to the President to compel the transfer of alien property; and it was limited to property of an enemy or of an ally of an enemy; for, although § 5(b) authorized very wide power to investigate, it did not touch transfers. However, the amendment of 1941—in subsection (B) of subdivision one—gave power to the President not only to investigate "transactions involving, any property in which any foreign country or national thereof has any interest," but to "compel * * *

any * * * transfer" of such property; and as the section expressly covered all property "subject to the jurisdiction of the United States," it included shares of stock in a domestic corporation. Stoehr v. Wallace, 255 U.S. 239, 41 S.Ct. 293, 65 L.Ed. 404; Great Northern Railway Company v. Sutherland, 273 U.S. 182, 47 S.Ct. 315, 71 L.Ed. 596. The power of Congress to seize and confiscate enemy property rests upon Art. 1, § 8, Clause 11 of the Constitution. Stoehr v. Wallace, supra, 255 U.S. at page 242, 41 S.Ct. 293, 65 L.Ed. 404; United States v. Chemical Foundation, Inc., 272 U.S. 1, 11, 47 S.Ct. 1, 71 L.Ed. 131. Whether it exists at international law may be doubted; but nobody contends that the war power of Congress includes the seizure of the property of friendly aliens. The amendment of § 5(b) must therefore rest upon some other power of Congress, not only for that reason, but because the amendment itself was expressly not limited to time of war (although it was in fact passed flagrante bello) but was to go into effect upon any "national emergency declared." It can rest upon Art. 1, § 8, Clause 1: i.e. upon the power "to provide for the common Defence and general Welfare"; indeed, so far as we can see, the debtor does not challenge the power itself, but its exercise. It complains that the amendment delegates an unrestricted discretion to the President, and does not provide "just compensation" for seizures.

■■ As to the first, it is true that the section gives the President an unrestricted power to be exercised at his discretion and without any standard except that he shall act through "rules and regulations." The only objection to this which can be raised is that it disturbs the constitutional "separation of powers"; for, since it is to be exercised by regulations, it cannot as such be said to subject individuals to unascertainable duties or penalties; that will depend upon the regulations themselves. The occasions upon which such a power should be exercised are incapable of catalogue or definition; or, indeed, of statement in any other terms than that the interest of the country demands the prescribed action. That is, however, enough. New York Central Securities Corporation v. United States, 287 U.S. 12, 53 S.Ct. 45, 77 L.Ed. 138. The separation of the executive from the legislative power is in the end a matter of degree anyway; thousands of decisions are made every day by administrative officers which involve a balance of conflicting interests—the characteristic field for legislation. That the power to seize property (call it executive or legislative as one will) may be lawfully conferred without attempting to fix the conditions, is proved by several other statutes of long standing and of universal acceptance: as for example, the power to condemn of the Federal Works Administrator (§ 341 of Title 40), that of any executive department in the District (§ 361 of Title 40), and that of the Secretary of War (§ 171 of Title 50). Indeed, the power conferred upon the President in § 7(c) of the Trading with the Enemy Act itself is without condition; and, so far as concerns unconstitutional delegation, it makes no difference that it is limited to enemy property. Nor does it matter that by Executive Order No. 9095, 50 U.S.C.A. Appendix, § 6 note, the President in turn delegated his powers to the Custodian, authorizing him to "vest" in himself the property of a friendly alien when he determined that this was "necessary in the national interest." That was in effect the same condition on which the President's own power was conferred; and in the nature of things the President cannot personally exercise the least fraction of the manifold powers of every description which are granted to him—more truly, which are imposed upon him. If he may not depute their exercise, they are as sterile as stones. Whether Executive Order No. 9095 was definite enough to be valid is separate from whether the power was improperly delegated by Congress. That objection is valid only in case the holder of the seized property may be subjected to duties which he cannot ascertain, which is clearly not true, for all seizures are made by orders ad hoc, and the duties imposed are clear and explicit.

■■ The next question is whether a friendly alien whose property has been seized may in any way secure "just compensation." Subsection (2) of § 5(b) de-

clares that compliance with any demand of the Custodian shall be a discharge of any "obligation" of the person on whom it is made, and a defence in any court against being held "liable." (We pass without discussion the patently untenable argument that this covers only "obligations" and liabilities to the United States.) This was necessary, in spite of § 7(c), because of the enlarged scope of § 5(b); and it left the friendly alien without remedy against the person who should make the transfer. Moreover, neither § 5(b) nor any other section of the Trading with the Enemy Act gave him any remedy, unless it were § 9(a). A friendly alien stands in a position different from either an enemy or a citizen whose property has been seized. A citizen may avail himself of § 9(a) to reclaim his property, as much when it has been seized under § 5(b) as under § 7(c); if he is successful in the suit, he will be restored to possession, for the seizure will be shown to have been unlawful. Such too was the position of a friendly alien under § 9(a) in the original Act. An enemy or an ally of an enemy is positively and intentionally denied relief, not only in § 9(a) but elsewhere, because his property may be forfeited; he can rely only upon the grace of Congress. But by hypothesis a friendly alien can not reclaim his property if the seizure has been lawful; and yet he cannot be deprived of it without just compensation, because the Fifth Amendment protects him. Russian Volunteer Fleet v. United States, 282 U.S. 481, 489, 51 S.Ct. 229, 75 L.Ed. 473. Thus it can be argued with much force that, unless some provision can be found by which he may secure compensation, § 5(b) is unconstitutional; and, if so, it would at best be doubtful whether the protection given by subsection (2) would be valid. It so chances that both the debtor and the Custodian take the position that a friendly alien may not sue under § 9(a). That may be so, for, although he would have formal capacity to sue under that section—not being an enemy or an ally of an enemy—in order to recover he would have to "establish" some "interest, right, or title" in the seized property; yet, if § 5(b) is valid, the seizure would be valid, and by the seizure all his "interest, right and title" would have "vested" in the Custodian. However that may be, it is settled by many decisions of which we need only cite the last—Yearsley v. W. A. Ross, 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554—that when the United States seizes the property of an individual, not an enemy, in pursuance of a public purpose, it impliedly promises to pay just compensation, and that that promise is "just compensation" under the Fifth Amendment. Submarine Signal Co. v. United States, 61 Ct. Cl. 652, turned altogether on Deutsch-Australische Dampfschiffs Gesellschaft v. United States, 59 Ct. Cl. 450, and has no application here. (The debtor appears to argue that the Custodian's "vesting" order did not intend to cover the interest of the Swiss banks as pledgees, but that is so plainly untrue, that it need not detain us.)

■ Next the debtor asserts that in any event § 8(a) protected the interest of the Swiss banks from seizure. It is true that in the original Act, § 8(a) protected a pledgee who was a friendly alien just as it protected a citizen pledgee; and, for argument, we will assume that it forbad disturbing the possession of any pledgee who was not himself an enemy or an ally of an enemy. But after the amendment of § 5(b) had extended the power to seize all interests of friendly aliens, § 8(a) could no longer protect their pledges, once the Custodian found that the interest of the United States demanded their seizure, any more than it protected the pledges of enemies or allies of enemies. Any other interpretation of the section would make the pledges of friendly aliens a wholly irrational exception to the general purpose to subject all alien interests to seizure.

■ Finally, we find no basis for the argument that the debtor should not be forced to issue new certificates while the Swiss banks hold the old ones, which the Supreme Court answered directly as to § 7(c) in Great Northern Ry. Co. v. Sutherland, 273 U.S. 182, 47 S.Ct. 315, 71 L.Ed. 596. To meet this the debtor reasons that, because § 7(c) specifically provides for the situation, and § 5(b) after its amendment does not, Congress must have had a different purpose as to the seizure of the shares

of a friendly alien. That is not really credible, for the result would be that, although when the Custodian seized the shares of an enemy or an ally of an enemy, he could get a new certificate and a marketable title, when he seized the shares of a friendly alien, he would have nothing but his right under the "vesting" order, a title which no buyer would accept. Yet § 5(b) (1) itself provides that the seized property may be sold. That is the sort of interpretation which sinks the purpose of the statute in a perverse loyalty to its text. Section 5(b) after its amendment remained a part of the original Act, quite as much as it had been before; of that the mere fact that it was an amendment ought to satisfy any sensible person. Had § 7(c) not contained the express provision for new certificates, we should have held without hesitation that such an incidental power was to be implied as part of the main power, both in § 7(c) itself and in § 5(b). And it would be a travesty of statutory construction to suppose that when Congress extended the scope of § 5(b) it meant to make transfers under it ineffective, because it did not incorporate expressly or by reference the ancillary provisions which out of abundant and unnecessary caution it had already incorporated in § 7(c).

■ The debtor raises other objections; indeed, it raises every conceivable objection; but we have considered all that deserve discussion, and perhaps more. The effort is of a kind which was often tried during the last war, always without success. The power of the United States peremptorily to reduce to its possession and apply to its use, at moments critical in its history, all property which lies within its power is not to be emasculated by the delays of private litigation; the peril may be overwhelming, the need imperative. It is enough that reparation will be available, where reparation is due; meanwhile the individual must comply with the immediate demand just as he must comply with the immensely more grievous demand for the possible sacrifice of life and limb, when that too is called for.

Order affirmed.