SILESIAN-AMERICAN CORP. ᴇᴛ ᴀʟ. *v.* CLARK, ATTORNEY GENERAL, AS SUCCESSOR TO THE ALIEN PROPERTY CUSTODIAN.

No. 6. Argued May 1, 1947.—Reargued November 12, 1947.— Decided December 8, 1947.

470

*Leonard P. Moore* argued the cause for petitioners. With him on the briefs were *George W. Whiteside* and *William Gilligan.*

*James C. Wilson* argued the cause on the original argument for respondent. With him on the brief were *Acting Solicitor General Washington, Assistant Attorney General Sonnett, Harry LeRoy Jones, M. S. Isenbergh, James L. Morrisson* and *John Ward Cutler.*

*James L. Morrisson* reargued the cause for respondent. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Bazelon* and *M. S. Isenbergh.*

MR. JUSTICE REED delivered the opinion of the Court.

The Alien Property Custodian on November 17, 1942, executed Vesting Order No. 370. This order was issued under the authority of the Trading with the Enemy Act, 40 Stat. 411, as amended, and Executive Order No. 9095, as amended, and in terms vested the property therein described in the Alien Property Custodian in the interest and for the benefit of the United States. The order found the property to belong to a national of Germany. The property covered by the order was two blocks of stock—one common, one preferred—in the Silesian American Corporation, a Delaware corporation, hereinafter called Silesian. The stock, prior to August 31, 1939, stood in the stock book of Silesian in the name of Non Ferrum Gesellschaft zur Finanzierung von Unternehmungen des Bergbaues und der Industrie der Nichteisenmetalle, Zurich, Switzerland, a Swiss corporation,

hereinafter referred to as the Non Ferrum Company. Non Ferrum, it was determined by the Custodian's order, held the stock for the benefit of Bergwerksgesellschaft Georg von Giesche's Erben, a German corporation. The certificates, it is asserted, had been deposited as security for loans with a group of banks, all of which apparently were chartered by Switzerland and are hereinafter referred to as the Swiss Banks.[1]

To carry out the purpose of his vesting order, the Custodian directed Silesian to cancel on its books the outstanding Non Ferrum certificates, above referred to, and to issue in lieu thereof new certificates to the Custodian. This controversy revolves around the objection of Silesian so to act because the Custodian did not have physical possession of the pledged Non Ferrum certificates so as to be able to surrender them for cancellation, as the corporation's by-laws required. Silesian feared liability to the holders of the Non Ferrum certificates for issuing other certificates in such circumstances.

Silesian had been a debtor under Chapter X of the Bankruptcy Act since July 30, 1941. It therefore asked the Bankruptcy Court for instructions as to its compliance with the Custodian's direction. The other petitioner here, Silesian Holding Company, a Delaware corporation also, appeared and throughout has remained as a party to this litigation. It is the majority stockholder of Silesian but claims no different or other interest in the issue than Silesian. For the purpose of this case, it may and will be treated as having no more interest in the issue than Silesian has. The Swiss Banks asked the Reorganization Court to give instructions to the Debtor that no new shares be issued until the controversy between the Swiss Banks and the Custodian could be "fully, firmly and finally ad-

---

[1] They are Union Bank of Switzerland, La Roche & Company, Banque Cantonale de Berne, and Aktiengesellschaft Leu & Company.

judicated." This prayer was based on a verified answer to Silesian's request for instruction, which answer alleged that the "Swiss Banks were the owners of the 'Non Ferrum' stock." The Swiss Banks notified Silesian that any issue of new certificates representing the Non Ferrum stock, with or without court direction, would be at Silesian's risk. Affidavits supporting the objection of the Swiss Banks to instructions to Silesian to issue the new certificates to the Custodian were filed with the District Court. These affidavits declared the Non Ferrum stock was pledged, prior to 1938, to groups of Swiss banks. It is not clear whether they are the same institutions that are named in the answer of the Swiss Banks to the Debtor's request for instructions. For the purpose of this case, we assume that the groups are identical.

The District Court instructed the debtor to issue new certificates to the Alien Property Custodian. The court said:

> "The vesting order of the Custodian found that the stock was held for the benefit of an enemy. The statutory discharge from liability, § 5b or § 7e, [Trading with the Enemy Act] protects the debtor corporation and relieves it of doubt in the premises."

The court added:

> "Whatever may be the interests or rights of the Swiss banks, they cannot be considered here. Hearsay statements, unsupported by documents, allege that these banks are pledgees of the stock. These statements create no issue for our consideration. The banks are parties herein only to the extent that they have been recognized in the reorganization proceeding as possible owners of a claimed interest which they have never been called upon to prove. They are not here because of any action taken against them

or any recognition given them by the Custodian or even by reason of any established interest in the stock."

No appeal to the Circuit Court of Appeals was taken by the Swiss Banks. They do not appear here as parties to this writ of certiorari or otherwise. We therefore express no opinion as to the effect of the order and decision of the District Court upon the claims of the Swiss Banks as pledgees of the Non Ferrum stock. See *Silesian-American Corporation* v. *Markham,* 156 F. 2d 793, 795.

An appeal was taken to the Circuit Court of Appeals by Silesian. That court affirmed the order of the Bankruptcy Court. We first denied a petition for certiorari and then granted it so that this case might be considered in relation to other issues, thereafter presented here, in connection with the administration of the Trading with the Enemy Act. 329 U. S. 730 and 330 U. S. 852; *Clark* v. *Uebersee Finanz-Korporation,* 330 U. S. 813.

It was held by the Circuit Court of Appeals that Silesian had no "standing vicariously" to assert the interests of its shareholders. We agree. Silesian has no legal interest in the issue as to the ownership of its stock. It follows that Silesian has no standing to represent the interests of the pledgees of the Non Ferrum shares, if that is the present position of those shares. See *Anderson Nat. Bank* v. *Luckett,* 321 U. S. 233, 242. This reduces petitioners' objection to the order directing the issue of new certificates in favor of the Custodian for the Non Ferrum stock to the claim that the sections of the Trading with the Enemy Act under which the Custodian acted are invalid as applied to Silesian in these circumstances. If the provisions do not authorize the order and direction, Silesian, over its own objections, cannot be compelled to obey.

The Custodian vested the stock in himself by virtue of the Trading with the Enemy Act, as amended by the First

War Powers Act of 1941, including, of course, § 5 (b) (1),[2] and Executive Order No. 9095, C. F. R. Cum. Supp. 1121, as amended 1174. This property was vested during war. There is no doubt but that under the war power,[3] as heretofore interpreted by this Court, the United States, acting under a statute, may vest in itself the property of a national of an enemy nation. Unquestionably to wage war successfully, the United States may confiscate enemy property. *United States* v. *Chemical Foundation,* 272 U. S. 1, 11. Nor can there, we think, be any doubt that any property in this country of any alien may be summarily reduced to possession by the United States in fur-

---

[2] Trading with the Enemy Act, 40 Stat. 411, as amended by the First War Powers Act of 1941, 55 Stat. 839, § 5 (b) (1):

"During the time of war or during any other period of national emergency declared by the President, the President may, through any agency that he may designate, or otherwise, and under such rules and regulations as he may prescribe, by means of instructions, licenses, or otherwise—

.        .        .        .        .

"(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest,

by any person, or with respect to any property, subject to the jurisdiction of the United States; and any property or interest of any foreign country or national thereof shall vest, when, as, and upon the terms, directed by the President, in such agency or person as may be designated from time to time by the President, and upon such terms and conditions as the President may prescribe such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States, and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes; . . . ."

[3] Art. I, § 8, cl. 11.

therance of the war effort.  Every resource within the ambit of sovereign power is subject to use for the national defense.  This section was amended during war to cover the taking of alien property.  It is limited to a war or a declared emergency period.  While a natural hesitancy exists against so interpreting the war power clause as to expand its scope to cover incidents not intimately connected with war, we think reasonable preparation for the storm of war is a proper exercise of the war power.  This seizure of alien property, in a time of emergency, is of that character.  We need not consider whether the general welfare clause could be a source of congressional power over alien property.[4]  This taking may be done as a means of avoiding the use of the property to draw earnings or wealth out of this country to territory where it may more likely be used to assist the enemy than if it remains in the hands of this government.  Or the commandeered property of a friendly alien may be used to prosecute the war.  The problems of compensation may await the judicial process.  *Central Union Trust Co. v.*

---

[4] Compare with the statement below: "The power of Congress to seize and confiscate enemy property rests upon Art. 1, § 8, Clause 11 of the Constitution.  Stoehr v. Wallace, supra, 255 U. S. at page 242 . . . ; United States v. Chemical Foundation, Inc., 272 U. S. 1, 11 . . . .  Whether it exists at international law may be doubted; but nobody contends that the war power of Congress includes the seizure of the property of friendly aliens.  The amendment of § 5 (b) must therefore rest upon some other power of Congress, not only for that reason, but because the amendment itself was expressly not limited to time of war (although it was in fact passed flagrante bello) but was to go into effect upon any 'national emergency declared.'  It can rest upon Art. 1, § 8, Clause 1: i. e. upon the power 'to provide for the common Defence and general Welfare'; indeed, so far as we can see, the debtor does not challenge the power itself, but its exercise.  It complains that the amendment delegates an unrestricted discretion to the President, and does not provide 'just compensation' for seizures."  156 F. 2d 793, 796.

*Garvan,* 254 U. S. 554, 567–68. War brooks no delay. The Constitution imposes none.

The section, 5 (b) (1), and Executive Order under which the Custodian acted authorized the vesting in him by his order of the property of a foreign national. This description covered stock ownership of a foreign national in Silesian. The fact that the certificates did not come into the hands of the Custodian is immaterial. They are evidences of the property right of the foreign national in Silesian that is subject to be vested in the Custodian by the Act. See *Great Northern R. Co.* v. *Sutherland,* 273 U. S. 182. Section 5 (b) (1) specifically states, "and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes." See note 2 above. Since the Custodian was authorized to vest and to sell the property by § 5, we think that the power to require the issue of new certificates was incidental to that authority. As one purpose of § 5 (b) (1) was to authorize the seizure of the interests of foreign nationals in domestic corporations so that such interest could be used or sold, such authority to participate in management or to transfer the stock interests would be frustrated if customary evidences of the ownership could not be required from the corporation. The power of the Custodian to demand the certificates is plain. The correlative duty to obey the order equally so, if the effect of obedience does not do violence to other valid requirements of the statute or make Silesian liable to bona fide holders of the old stock.

Silesian in specific terms is protected from any liability to bona fide holders such as Non Ferrum or the Swiss Banks by reason of any infirmity in the Custodian's vesting order or his direction to Silesian to issue new certificates for the Non Ferrum stock. The applicable language of § 7 (e) of the Trading with the Enemy Act, 40

Stat. 418, and § 5 (b) (2), as amended, 55 Stat. 839–40, are set out in the margin.[5]   But Silesian argues that protection cannot follow from an order contrary to the Trading with the Enemy Act.   The order to issue the new certificates is said to be unauthorized because it allows the property of friendly alien pledgees, the Swiss Banks, to be taken contrary to § 8 (a).[6]   Section 8 (a) is said to be a limitation on the Custodian's power to seize property pledged to "any person not an enemy or ally of enemy." It is suggested that if § 7 (e) or § 5 (b) (2) is interpreted to require Silesian to carry out the Custodian's

[5] 40 Stat. 418, § 7 (e):

"No person shall be held liable in any court for or in respect to anything done or omitted in pursuance of any order, rule, or regulation made by the President under the authority of this Act."

55 Stat. 840, § 5 (b) (2):

"Any payment, conveyance, transfer, assignment, or delivery of property or interest therein, made to or for the account of the United States, or as otherwise directed, pursuant to this subdivision or any rule, regulation, instruction, or direction issued hereunder shall to the extent thereof be a full acquittance and discharge for all purposes of the obligation of the person making the same; and no person shall be held liable in any court for or in respect to anything done or omitted in good faith in connection with the administration of, or in pursuance of and in reliance on, this subdivision, or any rule, regulation, instruction, or direction issued hereunder."

[6] 40 Stat. 418–19, § 8 (a):

"That any person not an enemy or ally of enemy holding a lawful mortgage, pledge, or lien, or other right in the nature of security in property of an enemy or ally of enemy which, by law or by the terms of the instrument creating such mortgage, pledge, or lien, or right, may be disposed of on notice or presentation or demand . . . may continue to hold said property, and, after default, may dispose of the property . . . . *Provided further,* That if, on any such disposition of property, a surplus shall remain after the satisfaction of the mortgage, pledge, lien, or other right in the nature of security, notice of that fact shall be given to the President pursuant to such rules and regulations as he may prescribe, and such surplus shall be held subject to his further order."

direction, even though this seizure is contrary to § 8 (a), a way has been found to "coerce an interested party [Silesian] into compliance with his [the Custodian's] unlawful actions." The answer to this contention is made by the Circuit Court of Appeals. It makes unnecessary any discussion of the protection afforded Silesian by § 7 (e) and § 5 (b) (2) from the claims of a pledge of stock exempted by statute from seizure. 156 F. 2d at 797. When § 5 (b) (1) was enacted as an amendment in the First War Powers Act of 1941, it authorized the taking of any property or interest therein of any foreign national. This broadening of the scope of the Custodian's power to vest so as to include interests of friendly aliens in property includes the power to vest the interest which friendly aliens have from pledges. As the Circuit Court of Appeals said, p. 797:

"Any other interpretation of the section would make the pledges of friendly aliens a wholly irrational exception to the general purpose to subject all alien interests to seizure."

Therefore, as we hold that § 5 (b) (1) rendered § 8 (a) inapplicable to the property of friendly aliens, the order of the Custodian was valid and Silesian's objection disappears.

Finally there is the argument that Silesian cannot be compelled to issue the new certificates because the friendly aliens who claim interests in the Non Ferrum stock may not succeed in recovering the just compensation for the taking. See *Russian Volunteer Fleet* v. *United States,* 282 U. S. 481, 489.[7] The Constitution guarantees to friendly aliens the right to just compensa-

---

[7] The Circuit Court of Appeals said: "Thus it can be argued with much force that, unless some provision can be found by which he may secure compensation, § 5 (b) is unconstitutional; and, if so, it would at best be doubtful whether the protection given by subsection (2) would be valid." 156 F. 2d 793, 797.

480

tion for the requisitioning of their property by the United States. *Russian Fleet* v. *United States, supra.* We must assume that the United States will meet its obligations under the Constitution. Consequently, friendly aliens will be compensated for any property taken and Silesian is protected by the exculpatory clauses of the Act from any claim from its alien stockholders.

*Judgment affirmed.*

THE CHIEF JUSTICE took no part in the consideration or decision of this case.