McGRATH, Atty. Gen., v. CITIES SERVICE CO. et al.

No. 25, Docket 21925.

United States Court of Appeals Second Circuit.

Argued May 2, 1951.

Decided June 13, 1951.

9. Similar coercion was shown in the Uyeno case, supra, not cited by appellee.

George B. Searls, Dept. of Justice, Washington, D. C., Harold I. Baynton, Asst. Atty. Gen., Irving H. Saypol, U. S. Atty., New York City, James D. Hill, Irwin A. Seibel, Department of Justice, Washington, D. C., for appellant.

William M. Evarts, New York City, Frueauff, Burns, Ruch & Farrell, and Milbank, Tweed, Hope & Hadley, all of New York City, for appellees.

Before CHASE, FRANK and L. HAND, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from a judgment summarily dismissing the complaint of the Attorney-General as substituted owner of three negotiable bonds, payable to bearer, against the Cities Service Company, the obligor, and the Chase National Bank of New York, the "indenture trustee." The plaintiff claimed to have become the obligee of the bonds by virtue of a "vesting" order, issued by him as Alien Property Custodian under § 7(c) and § 5(b) of the Trading with the Enemy Act;[1] and the only issue is whether upon the conceded facts he is right. Of the original three bonds one had been paid before the "vesting order" was made, and of the remaining two, one has come into the hands of brokers in New York who are holding it for an American insurance company, and the whereabouts of the other is wholly unknown. At some undisclosed time a German citizen became the owner of all three bonds, from whom "the occupying authorities" of the "Russian Sector of Berlin" had seized them before March 11, 1949, the day of the "vesting order." Each party moved for summary judgment, and the judge held that the order did not "vest" the bonds in the plaintiff because, since bonds were outside the United States when "vested," they were as much beyond the power of the Alien Property Custodian as chattels situated in Germany. That is also the defendants' argument on this appeal; they say that the Act is limited to property within the United States and that as the actual instruments were not in this country, and were not mere evidences of the debt, but the very debt itself, they were not "within the United States," and subject to seizure. Further, they argue that, if we hold that the Act covered such debts, they will not be adequately protected from future suits by possible bona fide holders, which place them in a position of very grave doubt constitutionally.

As to the defendants' first objection, we have no doubt that the Act applies to bonds issued by a citizen of the United States and held by an alien outside the country. That it meant to cover debts or obligations owed to aliens—including bonds—appears in several places. Thus § 7(c) says that: "If the President shall so require any money or other property including * * * choses in action, and rights and claims of every character and description owing or

1. §§ 7(c) and 5(b), Title 50, U.S.C.A. War Appendix.

belonging to \* \* \* an enemy \* \* \* shall be \* \* \* paid over to the Alien Property Custodian, or \* \* \* may be seized" by him. Again, § 7(e) declares that "in case of payment to the alien property custodian of any debt or obligation owed to an enemy", he shall have power to execute a valid discharge and shall "deliver up any notes, bonds, or other evidences of indebtedness or obligation \* \* that may have come into" his "possession." Finally, § 9(n) declares that: "In the case of property consisting \* \* \* of bonded or other indebtedness \* \* \* evidenced \* \* \* by bonds \* \* \* where the right, title, and interest in the property (but not the actual \* \* \* bond \* \*) was conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian, or seized by him," the true owner may be indemnified, as provided in § 9(b), 50 U.S.C.A.Appendix, § 9(n, b).

■ As we understand the defendants' objection it is further that, even though the intent of the Act was to make all debts and choses in action, including bonds, subject to seizure, it was *brutum fulmen* as to bonds which are outside the United States at the time of "vesting," just as it is as to chattels so situated.[2] It is the bond, the document itself, which constitutes the debt, and whose location determines its "situs," regardless of the residence of the obligor and the power over him of the state where that residence may be. It is true that for centuries it was the English law that sealed instruments of any kind—bonds among them—could not be sued on without "profert" of the original. The obligor was entitled to "crave oyer," and judgment for the obligee was conditional upon his compliance. It followed that, if the obligee lost the instrument, or if it were mutilated, he could not sue. Equity soon intervened and in 1804 Lord Elden was able to say: "The

jurisdiction of this Court upon lost bonds is very ancient: founded upon a notion, acknowledged until a very late period, that there was no remedy at law upon a lost bond, as you could not make Profert."[3] The courts of law had already followed suit, though not until 1789;[4] but equity still retained its jurisdiction;[5] and the equitable remedy certainly became a part of the general law of this country.[6] Whether this archaic doctrine depended upon some mythical identification of the legal relation between the parties with the document is not important, even were we compelled to recognize it; the intervention of equity has dispelled it as a precedent, and in any event it is too patently a confusion of the legal rights and duties involved to constitute a bar to the constitutional powers of any state. Of itself a document—whether a deed, a bond, or any other sealed instrument—obviously is, and can be, nothing more than a piece of parchment or paper. Even though it were only when equipped with the document, that the obligee could invoke against the obligor the sanctions which the law provided, the obligation always consisted, and could only consist of the power the law gave him to invoke those sanctions to coerce the obligor, and that was equally true even while possession of the document was a condition upon that power. Moreover, even if that had not been true, as soon as equity dispensed with that condition there remained no difference between a bond and any other "chose in action," which could affect the constitutional power of a state over the obligor. Blackstone v. Miller, 188 U.S. 189, 205, 206, 23 S.Ct. 277, 278, 47 L.Ed. 439, remains, though after a somewhat checkered history,[7] the simplest statement of the situation:

"What gives the debt validity? Nothing but the fact that the law of the place where

---

2. Frick v. Pennsylvania, 268 U.S. 473, 45 S.Ct. 603, 69 L.Ed. 1058.

3. East India Company v. Boddam, 9 Ves. jr. 464, 466.

4. Read v. Brookman, 3 Term Rep. 151.

5. Atkinson v. Leonard, 3 Brown's Ch.Cas. 218.

6. Midkiff v. Colton, 4 Cir., 252 F. 420; Prescott v. Williamsport & N. B. R. Co., C.C., 159 F. 244.

7. Farmers Loan & Trust Co. v. Minnesota, 280 U.S. 204, 50 S.Ct. 98, 74 L.Ed. 371; State Tax Commission of Utah v. Aldrich, 316 U.S. 174, 62 S.Ct. 1008, 86 L.Ed. 1358; Standard Oil Co. v. New Jersey, 341 U.S. 428, 71 S.Ct. 822.

the debtor is will make him pay. It does not matter that the law would not need to be invoked in the particular case. * * *

"Power over the person of the debtor confers jurisdiction, we repeat." It is true that Holmes, J., did then go on to distinguish "State Tax on Foreign-held Bonds," 15 Wall. 300, 21 L.Ed. 179, on the ground that bonds had there been involved and that in such cases "The debt is inseparable from the paper which declares and constitutes it, by a tradition which comes down from more archaic conditions", 188 U.S. at page 206, 23 S.Ct. at page 279. We agree that that gives color to the defendants' position; yet with deference we read that language as no more than a way of avoiding a precedent which the court had decided to overrule. Furthermore, the distinction was altogether gratuitous, for in "State Tax on Foreign-held Bonds," *supra,* the court did not even intimate that it was a reason for the result; on the contrary it repeatedly spoke in language which would have held the tax invalid had it been imposed upon any kind of chose in action. The notion was that the "situs"—a word most destructive when used in this connection—was the residence of the obligee. For the foregoing reasons we hold that the Act meant to authorize the seizure of the obligation "evidenced"—we use that word deliberately—by bonds outside the country, as well as any of other alien held choses in action; and that as an incident to his seizure the Alien Property Custodian may sue upon such a bond as surrogate of the holder. There remains the question whether the exercise of such a power raises any constitutional doubts, as the defendants insist.

■ Their argument can be most forcibly stated as follows. Although the statute affects to discharge an obligor whom the Alien Property Custodian has compelled to pay the bond—§ 5(b) (2) and § 7(e)—and, although the statute may be a complete protection against suits brought later in any court of the United States by a bona fide holder of the bonds, it does not follow that it will be a good discharge in the court of a foreign state. Both defendants at bar are especially exposed to such suits: the Cities Service Corporation owns tankers that enter ports all over the world, and they will be constantly exposed to attachment or other proceedings *in rem;* the Chase Bank has a number of offices in Europe with assets similarly vulnerable; and it is to the last degree uncertain whether a foreign court, indeed any foreign court, will accept payment to the Alien Property Custodian as a valid discharge of the debt, and a defence to the suit. We recognize the force of this reasoning, and we shall assume for argument that, if it were true that the defendants remain exposed to such a recovery, and will have no consequent claim against the Treasury for recoupment, a judgment against them will "take" their property without compensation in violation of the Fifth Amendment. Upon that hypothesis the case therefore turns upon whether they will have such a claim, if they are later forced to pay a bona fide holder.

We are satisfied that they will have. The Supreme Court in a long line of decisions which we cite in the margin has settled it that, when the United States "takes" property for a public purpose, an implied promise arises to pay compensation to the owner, even though no statute so provided.[8]

8. United States v. Great Falls Mfg. Co., 112 U.S. 645, 5 S.Ct. 306, 28 L.Ed. 846; Great Falls Mfg Co. v. Attorney General, 124 U.S. 581, 8 S.Ct. 631, 31 L.Ed. 527; United States v. Lynah, 188 U.S. 445, 465, 23 S.Ct. 349, 47 L.Ed. 539; Tempel v. United States, 248 U.S. 121, 39 S.Ct. 56, 63 L.Ed. 162; United States v. North American Transp. & Trading Co., 253 U.S. 330, 333, 40 S.Ct. 518, 64 L.Ed. 935; Campbell v. United States, 266 U.S. 368, 370, 371, 45 S.Ct. 115, 69 L.Ed. 328; Phelps v. United States, 274 U.S. 341, 343, 344, 47 S.Ct. 611, 71 L. Ed. 1083; International Paper Co. v. United States, 282 U.S. 399, 407, 51 S. Ct. 176, 75 L.Ed. 410; Hurley v. Kincaid, 285 U.S. 95, 52 S.Ct. 267, 76 L.Ed. 637; Yearsley v. W. A. Ross Construction Co., 309 U.S. 18, 21, 60 S.Ct. 413, 84 L.Ed. 554; United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206.

All the conditions on which that doctrine depends will exist, if a bondholder succeeds in recovering from the defendants in a foreign court, after the plaintiff has recovered here. The obligor has of course consented to the "taking" of his property by the promisee; and to the sanctions that may be necessary to overcome his resistance. Moreover, in the case of a negotiable instrument, like the bonds at bar, the promisee is the holder; but the Alien Property Custodian by hypothesis is not the holder. When he compels the obligor to pay him, he "takes" the obligor's property in the constitutional sense; he totally deprives the obligor of what he collects, and he does so in execution of a public purpose of the United States. The obligor must be entitled to "just compensation" for his loss in one form or another, if that "taking" is to be valid. If the Act could give the obligor a discharge that protected him against any recovery by the promisee—the holder—that would be "just compensation"; and that is what the Act—§ 5(b) (2) and § 7(e)—does attempt to do and is effective to do in any court of the United States; but by hypothesis it may not be a discharge in a foreign court. To complete that "just compensation" which in one form or another he must have, the obligor must acquire the power to recoup himself out of the Treasury. For these reasons it appears that all the conditions are realized on which the doctrine in question depends.

Indeed the question was really concluded by the decision of the Supreme Court in Silesian-American Corporation v. Clark, 332 U.S. 469, 68 S.Ct. 179, 184, 92 L.Ed. 81, where the interest of certain Swiss banks was at stake, which were pledgees of shares of stock in a domestic corporation. The Alien Property Custodian had seized these shares because the owners, the pledgors, were enemy aliens; and he demanded that the corporation should issue shares to him in substitution for those seized. The corporation objected. It argued that, if the pledgees demanded recognition of their rights, the discharge granted it by the Act would not protect it; because, although the Act allowed the pledgees' interest to be seized, it gave them no recourse to the Treasury. Moreover, if the pledgees had no such recourse, their property could not lawfully be taken from them, from which it would follow that they could compel the corporation to issue shares to them as well as to the Alien Property Custodian. This was a sound argument, because by the amendment of § 5(b) in 1941 the Alien Property Custodian got power to seize and sequestrate the property of a foreign alien who was not an enemy—§ 5(b) (1)—yet § 9(a) gave relief only to a person who could "establish" an "interest" in the property, and in the case there at bar the interest of the foreign pledgees had been "vested" in the Alien Property Custodian. Moreover, since the property of friendly foreign nationals is protected by the Fifth Amendment, it followed that the seizure—the "taking"—was unconstitutional, unless they had a claim against the Treasury for their loss. In this indirect way it became evident that only in case the pledgees had such a claim was the claim of the Alien Property Custodian valid against the corporation. The Supreme Court dealt with this aspect of the case in the following language: "The Constitution guarantees to friendly aliens the right to just compensation for the requisitioning of their property by the United States. Russian Volunteer Fleet v. United States, supra [282 U. S. 481, 51 S.Ct. 229, 75 L.Ed. 473]. We must assume that the United States will meet its obligations under the Constitution. Consequently, friendly aliens will be compensated for any property taken and Silesian is protected by the exculpatory clauses of the Act from any claim from its alien stockholders."[9] When the case was before us, we developed the same reasoning in a little more detail.[10] The contract in that case was "implied" in favor of the pledgees, while here it must be "implied" in favor of the defendants, but the principle is precisely the same; and indeed we rested

---

9. Silesian-American Corp. v. Clark, supra, 332 U.S. 469, at pages 479, 480, 68 S. Ct. 179, at page 184.

10. Silesian-American Corporation v. Markham, 2 Cir., 156 F.2d 793, 797.

our ruling upon those very decisions which we have cited more at length here.

There can be no doubt that the result we reach accords with the purpose of the Act and with the policy of the United States in both wars. To make it impossible for the Alien Property Custodian to reduce to possession debts or choses in action owed to aliens by our citizens would exempt a vast amount of enemy property, perhaps even the greater part that is within our reach. Without such an "implied contract" every obligor, certainly if he had business abroad, might with justice complain that the Act did not protect him, and it would be hard to find any answer to his claim that the Constitution protected him. Once it is decided that bonds stand in no different position from any other chose in action, the result is plain. That they do not is equally plain.

Judgment reversed: summary judgment to be entered for the plaintiff on his motion.