**William P. ROGERS, Attorney General of the United States, as Successor to the Alien Property Custodian, Plaintiff,**

v.

**Elbert S. SMITH, Auditor of Public Accounts, State of Illinois**

**and**

**Joseph D. Lohman, State Treasurer of the State of Illinois, Defendants.**

**Civ. A. No. 2711.**

United States District Court
S. D. Illinois, S. D.
June 14, 1960.

**402**

Harlington Wood, Jr., U. S. Atty., Springfield, Ill., and Joseph D. Moore, of the Office of Alien Property, Department of Justice, Washington, D. C., for plaintiffs.

Grenville Beardsley, Atty. Gen. of Illinois and Lucien S. Field, Asst. Atty. Gen. of Illinois, for defendants.

POOS, District Judge.

This is a proceeding filed by William P. Rogers, Attorney General of the United States as successor to the Alien Property Custodian, by virtue of the Executive Order No. 9788, published in 11 F.R. 11981 dated October 14, 1946, 50 U.S. C.A.Appendix, § 6 note, invoking the jurisdiction of this Court under Section 17 of the Trading with the Enemy Act as amended (40 Stat. 425, 50 U.S.C.A. Appendix, § 17) and 28 U.S.C.A. § 1345. The defendant, Elbert S. Smith, is the auditor of Public Accounts in the State of Illinois and the defendant, Joseph D. Lohman is the State Treasurer of the State of Illinois. The State of Illinois issued State of Illinois Service Compensation bonds in the amount of $1,000 each dated January 1, 1924, due August 1, 1942, numbered 12926, 12937/45 inclusive, 13628/32 inclusive, and 13876/85 inclusive, bearing interest at the rate of 4¾% per annum payable semiannually. By Vesting Order No. 14772 executed June 20, 1950, filed with the Federal Register July 10, 1950 and published in 15 F.R. 4388, dated July 11, 1950 as amended by an amendment issued May 25, 1956, filed with the Federal Register May 31, 1956 and published in 21 F.R. 3734 dated June 1, 1956, the then Attorney General of the United States, predecessor to the plaintiff herein, vested the debts or other obligations evidenced by the bonds described above and the debts or other obligations evidenced by the coupons attached to or detached from said bonds having due dates on or after August 1, 1940, and thereafter demanded payment thereof from the defendants. The defendants and their predecessors in office paid to the Attorney General of the United States the debts evidenced by the bonds above described but for the reason that the coupons appurtenant to said bonds were not annexed thereto and were not presented for payment to them, the defendants have refused payment to the plaintiff of the debts evidenced by these coupons. The defendants contend that the coupons representing the vested debts are bearer instruments, the title to which was in the person who possessed them; that the payment of said debts is conditioned upon the presentation of the coupons evidencing such debts, and that if payment

was made to the plaintiff and the coupons were thereafter presented for payment to defendants by persons other than the plaintiff, the defendants might by reason thereof, be held liable therefor. The plaintiff contends that the debts represented by the coupons appurtenant to said bonds, which neither the plaintiff nor his predecessor have ever found or possessed, are the property of the United States and that if payment of said coupons is made to plaintiff pursuant to the terms of the vesting order, then the defendants are amply protected against double liability by the provisions of Section 5(b) (2) and Section 7(e) of the Trading with the Enemy Act as amended, 50 U.S.C.A.Appendix, §§ 5(b) (2), 7(e). These Sections of the Trading with the Enemy Act read as follows:

Section 5(b) (2) of the Trading with the Enemy Act, as amended, provides:

"(2) Any payment, conveyance, transfer, assignment, or delivery of property or interest therein made to or for the account of the United States, or as otherwise directed, pursuant to this subdivision or any rule, regulation, instruction, or direction issued hereunder shall to the extent thereof be a full acquittance and discharge for all purposes of the obligation of the person making the same; and no person shall be held liable in any court for or in respect to anything done or omitted in good faith in connection with the administration of, or in pursuance of and in reliance on, this subdivision, or any rule, regulation, instruction, or direction issued hereunder."

Section 7(e) of the Trading with the Enemy Act, as amended, provides:

"(e) No person shall be held liable in any court for or in respect to anything done or omitted in pursuance of any order, rule, or regulation made by the President under the authority of this Act.

"Any payment, conveyance, transfer, assignment, or delivery of money or property made to the alien property custodian hereunder shall be a full acquittance and discharge for all purposes of the obligation of the person making the same to the extent of same. The alien property custodian and such other persons as the President may appoint shall have power to execute, acknowledge, and deliver any such instrument or instruments as may be necessary or proper to evidence upon the record or otherwise such acquittance and discharge, and shall, in case of payment to the alien property custodian of any debt or obligation owed to an enemy or ally of enemy, deliver up any notes, bonds, or other evidences of indebtedness or obligation, or any security therefor in which such enemy or ally of enemy had any right or interest that may have come into the possession of the alien property custodian, with like effect as if he or they, respectively, were duly appointed by the enemy or ally of enemy, creditor, or obligee. * * *."

The value of the debts represented by the coupons concerned is $3,562.50 and the plaintiff prays that the defendants who were charged with the responsibility of paying the debts of the State of Illinois, issue warrants according to the laws of the State of Illinois to discharge such debts.

The question presented in this cause is whether the provisions of the Trading with the Enemy Act which authorized the vesting by the President or his delegate of "any property or interest" including "choses in action, and rights and claims of every character and description," confer on the Attorney General as custodian, the right to seize, enforce, and obtain payment of an obligation of an American obligor evidenced by coupons from negotiable bearer of bonds which coupons have not come into the custodian's possession.

Section 7(c) of the Trading with the Enemy Act, as it was fashioned during World War I, empowers the President to seize the following enemy interests: "any money or other property including

* * * choses in action, and rights and claims of every character and description." 40 Stat. 411, 418, as amended, 40 Stat. 1020, 50 U.S.C.A.Appendix, § 7(c). By the World War II amendment to Section 5(b) of the Act, Congress added the authority to vest "any property or interest of any foreign country or national thereof." Title III of the First War Powers Act, 1941, 55 Stat. 839, 50 U.S.C.A.Appendix, § 616. The effect of this amendment was to broaden the Section 7(c) powers which the outbreak of World War II had revitalized. See Cities Service Co. v. McGrath, 342 U.S. 330, 72 S. Ct. 334, 96 L.Ed. 359; Markham v. Cabell, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165; Silesian-American Corp. v. Clark, 332 U.S. 469, 479, 68 S.Ct. 179, 92 L.Ed. 81; Clark v. Uebersee Finanz-Korp., 332 U.S. 480, 485–486, 488, 68 S.Ct. 174, 92 L.Ed. 88.

■ Unquestionably, the Act authorizes the seizure of "debts," as evidenced by bearer bonds. Cities Service Co. v. McGrath, supra. Cf. McGrath v. Manufacturers Trust Co., 338 U.S. 241, 246, 70 S.Ct. 4, 94 L.Ed. 31; Propper v. Clark, 337 U.S. 472, 69 S.Ct. 1333, 93 L. Ed. 1480. As the Supreme Court of the United States said in Cities Service Co. v. McGrath, supra, 342 U.S. at page 333, 72 S.Ct. at page 336:

"We believe that the Trading with the Enemy Act grants the authority necessary to vest obligations evidenced by domestic negotiable bearer debentures even though the debentures themselves are outside the United States. By § 7(c) of the Act, enacted during World War I, the President is given the authority to seize all enemy property, 'including * * * choses in action, and rights and claims of every character and description owing or belonging to * * * an enemy * * *.' At the beginning of World War II, Congress made an even broader grant of authority to the Executive through an amendment to § 5(b), providing that 'any property or interest of any foreign country or national thereof shall vest, when, as, and upon the terms, directed by the President * * *.' [citing cases]. That the obligations represented by negotiable bearer debentures come within these broad terms is beyond question."

The Custodian therefore has the power to seize a debt represented by a bearer debenture. It follows that he likewise has the power to seize the debt represented by a coupon even if detached from a bearer bond.

The recent history of Section 5(b) likewise shows an intention to cover bonds, particularly bonds which might otherwise be negotiated abroad. Following the Nazi invasion of Denmark and Norway in April 1940, the President, declaring a national emergency, issued Executive Order No. 8389 (5 F.R. 1400, April 10, 1940), 12 U.S.C.A. § 95a note, under the authority of Section 5(b) as amended by the Emergency Banking Act of March 9, 1933 (48 Stat. 1). The Order subjected to licensing controls transactions involving funds in which nationals of the invaded countries had any interest, thereby preventing the Axis from swallowing the American assets of such nationals. Certificates of stocks and bonds of American corporations, physically located in the invaded countries, constituted a particularly vulnerable class of property. In order to dispel any doubts regarding the application of Section 5(b) to property in such form, the section was amended by the Joint Resolution of May 7, 1940 (54 Stat. 179) to include expressly "any evidences of indebtedness or * * * of ownership of property."

When Congress enacted this Joint Resolution of May 7, 1940, it ratified the freeze order which had already been promulgated by the President (Executive Order No. 8389, April 10, 1940, 5 F.R. 1400) and the Treasury regulations implementing that Order (31 C.F.R. 1943 Cum.Supp. Sec. 130). Those regulations defined "property" to include "any debts, indebtedness or obligations, * * * notes, debentures, stocks, bonds, * * *

any other evidences of title, ownership or indebtedness, * * * negotiable instruments" (idem. Sec. 130.2(c) ). They required reports of "all [foreign-owned] property subject to the jurisdiction of the United States" and specifically the reporting by every domestic corporation "with respect to any shares of its stock or any of its debentures, * * * bonds, * * * or other obligations" (idem., Sec. 130.4(a) ), including bearer bonds (idem., Sec. 130, Appendix B, Pub.Cir. No. 4 Sec. 111, Class B(7) ).

In short, when this country entered the war in December 1941, the Congress had already conferred regulatory powers with respect to American securities, including those located abroad, and had ratified regulations which defined "property" to cover bearer bonds located abroad. Several days after the declaration of war, Section 5(b) was again amended (Sec. 301, First War Powers Act, 1941, 55 Stat. 839), this time to authorize the President to seize and to make affirmative use of the property already subject to controls. It seems obvious that Congress was not, after this country's entry into the war, excepting from the scope of the Act one particular class of property which it had included while the country was at peace.

There is not a word in any of these statutory provisions which would warrant attributing to Congress a purpose to except from the broad authority thus conferred the power of the Custodian to seize an interest because it is represented by a negotiable bond or a coupon detached from a bearer bond or because the holder of the bond is not within the United States. Indeed, to impute such a purpose to Congress would be, *pro tanto*, to frustrate its ultimate aim in enacting the Trading with the Enemy Act:—to permit of reduction "to possession by the United States in furtherance of the war effort" of "any property in this country of any alien." Silesian-American Corp. v. Clark, 332 U.S. 469, 475–476, 68 S.Ct. 179, 182, 92 L.Ed. 81.

■ It is, of course, true that the property of the alien must be "in this country." Ibid. An intangible obligation to pay, whether or not evidenced by a bond or negotiable instrument, has no "situs" in the sense of location in space. See First National Bank of Boston v. Maine, 284 U.S. 312, 328, 332, 52 S.Ct. 174, 76 L.Ed. 313; Powell, The Business Situs of Credits, 28 W.Va.L.Q. 89. What matters for purposes of "jurisdiction" is that the obligor is here and can be made to pay. Standard Oil Co. v. New Jersey, 341 U.S. 428, 71 S.Ct. 822, 95 L.Ed. 1078; Curry v. McCanless, 307 U.S. 357, 365–367, 59 S.Ct. 900, 83 L.Ed. 1339; State Tax Comm. v. Aldrich, 316 U.S. 174, 62 S.Ct. 1008, 86 L.Ed. 1358 (overruling First National Bank of Boston v. Maine, supra, on other grounds). In a real sense, there is property here which can be effectively dealt with when an obligor is here. Harris v. Balk, 198 U.S. 215, 222–223, 25 S.Ct. 625, 49 L.Ed. 1023; Chicago, Rock Island etc. Ry. v. Sturm, 174 U.S. 710, 715–716, 19 S.Ct. 797, 43 L.Ed. 1144. Cf. Canada Southern Ry. v. Gebhard, 109 U.S. 527, 3 S.Ct. 363, 27 L.Ed. 1020. The bond itself would be substantially worthless if the United States would not enforce its recognition by the obligor, and the same holds true of a coupon detached therefrom.

■ In the case of the Trading with the Enemy Act, the purpose of the seizure provisions was to reduce to possession all enemy property that can be reached so as to prevent enemy use thereof and to permit affirmative use by the United States. Propper v. Clark, 337 U.S. 472, 481, 484, 69 S.Ct. 1333, 93 L. Ed. 1480; Silesian-American Corp. v. Clark, 332 U.S. 469, 68 S.Ct. 179, 92 L.Ed. 81; United States v. Chemical Foundation, 272 U.S. 1, 9–10, 47 S.Ct. 1, 71 L.Ed. 131. And it makes no difference whether the securities in question are bearer bonds (as in the Cities Service case, supra, and Great Northern Railway v. Sutherland, 273 U.S. 182, 47 S.Ct. 315, 71 L.Ed. 596) or stock certificates endorsed in blank so that they may pass by delivery (as in Schrijver v. Sutherland, 57 App.D.C. 214, 19 F.2d 688 and

Baltimore & O. Railway Company v. Sutherland, 4 Cir., 18 F.2d 560).

█ Coupons unmatured at the date of vesting, being "mere incidents of the bonds" (Williamsburgh Sav. Bank v. Town of Solon, 136 N.Y. 465, 481, 32 N.E. 1058, 1062), would seem to be covered by the language of Vesting Order No. 14772: "any and all rights in, to and under said bonds." But there can be no question but that they are included within the following language contained in the Amendment to Vesting Order No. 14772:

> "Those certain debts or other obligations, matured and unmatured, evidenced by the bonds described in Exhibit A, *and evidenced by coupons attached to or detached from said bonds* and due on or after the respective dates set forth in said Exhibit A, said bonds and coupons issued in bearer form, together with any and all accruals to the aforesaid debts or other obligations, and any and all rights to demand, enforce and collect the same, and any and all rights in, to and under said bonds and coupons, * * *." (Emphasis supplied.)

By the issuance and publication of Vesting Order No. 14772, there was a "res" vesting of the debts represented by the bearer bonds and attached and detached coupons. A "res" vesting under the Trading with the Enemy Act takes the interests of all persons, wherever located and whether known or unknown. Stern v. Newton, 180 Misc. 241, 39 N.Y. S.2d 593. By the vesting, the plaintiff succeeded to all the rights of the holder "as completely as if by conveyance, transfer or assignment." Commercial Trust Co. v. Miller, 262 U.S. 51, 56, 43 S.Ct. 486, 488, 67 L.Ed. 858.

Although defendants admit in their answer that the debts and obligations represented by the bearer bonds with the attached coupons were lawfully vested, they deny that there was a lawful vesting of the debts and obligations represented by the detached coupons, and they contend that presentation of the coupons was a condition precedent to payment.

Defendants' position is analogous to that taken by the petitioners in the Cities Service Company v. McGrath case, supra, with respect to which the Supreme Court of the United States said in 342 U.S. at pages 333–334, 72 S.Ct. at page 336:

> "Petitioners urge, however, that the debentures themselves constitute the debt, and since the debentures were located outside of the United States at the time of vesting, the debts did not have a situs within the United States and therefore were not proper subjects of seizure. To apply this fiction here would not only provide a sanctuary for enemy investments and defeat the recovery of American securities looted by conquering forces; It would also restrict the exercise of the war powers of the United States. Congress did not so intend. The Custodian's authority to reach a debenture or bonded indebtedness without seizure of the instrument itself is explicitly recognized by § 9(n) of the Act, which provides that '[i]n the case of property consisting * * * of bonded or other indebtedness * * *, evidenced * * * by bonds or other certificates of interest * * * or indebtedness * *, where the right, title, and interest in the property (but not the actual * * * bond or other certificate of interest or indebtedness) was conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian, or seized by him * *,' then the President may, in proper cases, order return of 80% of the property.[2] Moreover, in giving

---

2. "Section 9(n) was added in 1928 by the Settlement of War Claims Act, 45 Stat. 254, which provided in general for the return of 80% of all seized property.

The purpose of § 9(n) was to authorize the President, where he had seized a stock or bond interest without seizing the instrument itself, to make such 80%

the Custodian this power to seize an interest represented by a bond or debenture without seizure of the actual instrument, Congress transgressed no constitutional limitations on its jurisdiction. As the Court of Appeals pointed out, the obligor, Cities Service Company, is within the United States and the obligation of which the debenture is evidence can be effectively dealt with through the exercise of jurisdiction over that petitioner. See Standard Oil Co. v. New Jersey, 1951, 341 U.S. 428, 438–439 [71 S.Ct. 822, 828, 95 L.Ed. 1078]."

It would be pointless to recognize the Custodian's right to seize underlying debts or obligations and yet refuse his demand for duplicates of the evidences thereof, or payment of the debts. The courts have recognized the necessity for the issuance of duplicate evidences of obligations to the appropriate official of the United States as a part of the administration and enforcement of the Trading with the Enemy Act, as amended. Such recognition is based upon the fact that that Act establishes a paramount Federal power over enemy property in the United States for the dual purpose of preventing use of such property by the enemy and permitting an affirmative use thereof by the United States Government itself, and those purposes cannot be frustrated by provisions of State law or acts of State officials. Cities Service v. McGrath, supra; Propper v. Clark, supra; Silesian-American Corporation v. Clark, supra; United States v. Chemical Foundation, supra.

return to the current holder of the instrument. See H.R.Rep. No. 17, 70th

Cf. Keppelmann v. Palmer, 91 N.J.Eq. 67, 108 A. 432.

■ Great Northern Railway v. Sutherland, supra, follows the long established rule that "Federal officers and Federal courts are not dependent upon State legislation for power to lay hold of property." Miller v. United States, 11 Wall. 268, 297, 20 L.Ed. 135; Columbia Brewing Company v. Miller, 5 Cir., 281 F. 289, 291. Any inconsistent provision of State law, as, for example the Negotiable Instruments Law or the Stock Transfer Act, must yield. Silesian-American Corporation v. Clark, supra; Great Northern Railway v. Sutherland, supra; Central Hanover Bank & Trust Co. v. Markham, D.C.S.D.N.Y., 68 F.Supp. 829, 831–832.

■ In my opinion, the debts evidenced by the detached coupons were property within the United States, which the Custodian was authorized to vest and enforce and the ownership of the debts and obligations evidenced by the detached coupons became vested in the plaintiff for the benefit of the United States and the plaintiff is now the owner thereof. Plaintiff has no obligation to surrender the detached coupons as a condition preceding their payment and the defendants are under a duty to comply with the terms of the vesting order and to cause a warrant to be issued to the Attorney General of the United States in discharge of these obligations. Upon the payment of these obligations, the defendants shall be acquitted and discharged for all purposes of the obligations as provided in the Trading with the Enemy Act.

Judgment shall be entered in favor of the plaintiff in the amount of $3,562.50.

Cong., 1st Sess. 21; S.Rep. No. 273, 70th Cong., 1st Sess. 30."